Slip Op. 14- 33

**UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

**CS WIND VIETNAM CO., LTD. and CS WIND CORPORATION,**

Plaintiffs,

v.

**UNITED STATES,**

Defendant,

**WIND TOWER TRADE COALITION,**

Defendant-Intervenor.

</td><td>

Before: Jane A. Restani, Judge

Court No. 13-00102

</td></tr>
</table>

<u>**OPINION**</u>

[Motion for judgment on the agency record in antidumping investigation granted in part.]

Dated: March 27, 2014

<u>Ned H. Marshak</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for the plaintiffs. With him on the brief were <u>Bruce M. Mitchell</u>, <u>Andrew B. Schroth</u>, <u>Kavit Mohan</u>, and <u>Dharmendra N. Choudhary</u>.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. With him on the brief were <u>Stuart F. Delery</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Daniel J. Calhoun</u>, Attorney, Office of the Chief Counsel for Trade Compliance and Enforcement, U.S. Department of Commerce, of Washington, DC.

<u>Robert E. DeFrancesco, III</u>, Wiley Rein, LLP, of Washington, DC, argued for the defendant-intervenor. With him on the brief were <u>Alan H. Price</u>, <u>Daniel B. Pickard</u>, and <u>Usha Neelakantan</u>.

Restani, Judge: This action challenges the U.S. Department of Commerce's

("Commerce") final results rendered in the antidumping ("AD")[1] investigation of certain wind

towers from Vietnam.  See Utility Scale Wind Towers from the Socialist Republic of Vietnam:

Final Determination of Sales at Less than Fair Value, 77 Fed. Reg. 75,984 (Dep't Commerce

Dec. 26, 2012) ("Final Determination"); Issues and Decision Memorandum for the Final

Determination in the Antidumping Duty Investigation of Utility Scale Wind Towers from the

Socialist Republic of Vietnam, A-552-814, (Dec. 17, 2012), available at

http://enforcement.trade.gov/frn/summary/vietnam/2012-30944-1.pdf (last visited Mar. 20, 2014)

("I&D Memo").  Plaintiffs CS Wind Vietnam Co., Ltd. and CS Wind Corp. (collectively "CS

Wind") seek remand of the Final Determination, contending Commerce erred in calculating its

dumping margin based on the application of certain surrogate values and adjustments.  Mem. of

Law in Supp. of Pls.' Rule 56.2 Mot. for J. upon the Agency R., ECF No. 26 ("Pl. Br.").

Defendant United States ("the government") and defendant-intervenor Wind Tower Trade

Coalition ("WTTC") argue that the Final Determination is based on substantial evidence and in

accordance with law.  Def.'s Mem. in Opp'n to Pls.' Mot. for J. upon the Agency R., ECF No. 32

("Def. Br."); Def.-Intvnr.'s Resp. to Pl.'s Mot. for J. on the Agency R., ECF No. 34 ("WTTC

Br.").  For the reasons stated below, the court remands in part and sustains in part the Final

Determination.

## BACKGROUND

Following a petition by WTTC, Commerce initiated an AD investigation into

certain wind towers from Vietnam.  See Utility Scale Wind Towers from the People's Republic

---

[1] Dumping is defined as the sale of goods at less than fair value, calculated by a fair comparison between the export price or constructed export price for the U.S. market and normal value in the home market.  See 19 U.S.C. §§ 1677(34), 1677b(a).

of China and the Socialist Republic of Vietnam: Initiation of Antidumping Duty Investigations,

77 Fed. Reg. 3440 (Dep't Commerce Jan. 24, 2012).  Because Vietnam is considered by

Commerce to be a non-market economy ("NME"), much of the investigation focused on

selecting surrogate values for valuing the various factors of production ("FOPs") used by CS

Wind in manufacturing wind towers.  See 19 U.S.C. § 1677b(c)(1).  These surrogate values were

then used to compute the normal value, representing the cost of production for CS Wind if it had

operated in a hypothetical market economy.  See id.  Before the agency, the parties primarily

disputed the proper surrogate value to use for steel plate, as it is the main input in the production

process for wind towers.  See I&D Memo at 2–15.  Disputes also arose over carbon dioxide

costs, weight discrepancies for the reported FOPs, market economy input purchases, and

brokerage and handling ("B&H") expenses.  See id. at 28–33, 37–42, 45–46, 48–51.

          After verification at CS Wind's offices in Korea and production facility in

Vietnam, Commerce calculated an average weighted dumping margin of 51.50 percent in its

Final Determination.  77 Fed. Reg. at 75,988.  As part of that determination, Commerce selected

a different financial statement to calculate surrogate financial ratios and, in doing so, modified

certain offsets to those ratios in a manner different from that advanced by the parties.  See I&D

Memo at 15–16, 26–27.  Commerce also adjusted both normal value and the U.S. sales price to

account for a discrepancy between CS Wind's reported material FOP weights and the "Packed

Weight" of the wind towers, as reported on packing lists.  Id. at 28–33.  CS Wind filed

ministerial error allegations based on both of these changes, but Commerce rejected them,

asserting that the adjustments were made based on intentional methodological choices.  CS Wind

Request to Correct Clerical Errors, bar code 3112173-01 (Dec. 26, 2012), ECF No. 27-12 (Aug.

8, 2013); Ministerial Error Memo at 2–3, bar code 3115888-01 (Jan. 18, 2013), ECF No. 28-9

(Aug. 9, 2013).  CS Wind subsequently filed suit and moved for judgment on the agency record,

asserting that Commerce acted contrary to law and without substantial evidence in determining

CS Wind's dumping margins.  See Pl. Br. 10–57.

      CS Wind presents six arguments challenging Commerce's Final Determination:

1) Commerce lacked substantial evidence and acted contrary to law when it used Global Trade

Atlas ("GTA") import data rather than Steel India data to value steel plate; 2) Commerce

impermissibly valued carbon dioxide based on GTA import data; 3) Commerce improperly

calculated surrogate financial ratios by failing to offset certain expenses with related income line

items; 4) Commerce acted contrary to law and without substantial evidence in rejecting the

market economy input prices paid for flanges, welding wire, and wire flux; 5) Commerce

impermissibly adjusted normal value based on a weight discrepancy and then incorrectly adjusted

the U.S. sales price; and 6) Commerce used an inflated document preparation fee in calculating

B&H expenses.  See id.

## JURISDICTION AND STANDARD OF REVIEW

      The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1581(c).  The

court will uphold Commerce's final determinations in trade remedy investigations unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.    Valuation of Steel Plate

      In NME AD cases, Commerce "shall determine the normal value of the subject

merchandise on the basis of the value of the factors of production utilized in producing the

merchandise." 19 U.S.C. § 1677b(c)(1)(B).  Among other costs, the factors of production

include "quantities of raw materials employed." Id. § 1677b(c)(3).  In calculating normal value,

"the valuation of the factors of production shall be based on the best available information

regarding the values of such factors in a market economy country or countries considered to be

appropriate by the administering authority." Id. § 1677b(c)(1)(B).  Furthermore, Commerce

"shall utilize, to the extent possible, the prices or costs of factors of production in one or more

market economy countries that are—(A) at a level of economic development comparable to that

of the nonmarket economy country, and (B) significant producers of comparable merchandise."

Id. § 1677b(c)(4).

      "Nowhere does the statute speak directly to any methodology Commerce must

employ to value the factors of production, indeed the very structure of the statute suggests

Congress intended to vest discretion in Commerce by providing only a framework within which

to work." Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23

CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999); see QVD Food Co. v. United States, 658 F.3d

1318, 1323 (Fed. Cir. 2011) (recognizing that Commerce is entitled to deference in interpreting

the undefined term "best available information").  Nonetheless, selection of the best available

information must be in line with the overall purpose of the antidumping statute, which the Court

of Appeals for the Federal Circuit has explained to be "determining current margins as accurately

as possible." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see

also Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994) ("[T]here is

much in the statute that supports the notion that it is Commerce's duty to determine margins as

accurately as possible, and to use the best information available to it in doing so."). In

calculating normal value in the NME context, the particular aim of the statute is to determine the

non-distorted cost of producing such goods. See Lasko Metal Prods., Inc. v. United States, 16

CIT 1079, 1081, 810 F. Supp. 314, 316–17 (1992).

      In past investigations and reviews, Commerce has articulated the standard it uses

in selecting from among competing surrogate values. See I&D Memo at 9 (citing Crystalline

Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic

of China: Final Determination of Sales at Less than Fair Value, and Affirmative Final

Determination of Critical Circumstances, in Part, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17,

2012); Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of the

First Administrative Review, 71 Fed. Reg. 14,170 (Dep't Commerce Mar. 21, 2006)). These

criteria include "a strong preference for valuing all FOPs in the primary surrogate country, as

well as a preference for prices which are period-wide, representative of a broad market average,

specific to the input in question, net of taxes and import duties, contemporaneous with the period

under consideration, and publicly available." Id. (footnotes omitted).

      Because steel plate is the primary input in wind towers, the valuation of the plates

is an important factor in determining normal value and the resulting dumping margin. Before the

agency, CS Wind proposed six different data sets[2] for valuing the steel plate, and pointed to at

---

[2] CS Wind put on the record steel price data from Steel India, Steel Chamber, Steel Mint, JPC, MEPS (India), and Metal Expert India (domestic). See CS Wind First SV Submission, Exs. 3B, 3C, 3D, 3F, PD 3 at bar code 3075091-03-07 (May 10, 2012), ECF No. 28-2 (Aug. 9, 2013); CS Wind Pre-Preliminary Comments, Ex. 3, CD 4 at bar code 3084019-05 (June 29, 2012), ECF No. 27-3 (Aug. 8, 2013); CS Wind Post-Preliminary SV Submission, Ex. 1D, PD 6 at bar code 3096954-01 (Sept. 14, 2012), ECF No. 28-4 (August 8, 2013). These data valued the (relevant

(continued...)

least ten other data sets[3] that purportedly corroborated these prices.  Pl. Br. Ex. 1 (summarizing

data sets).  Commerce instead relied upon Indian import statistics obtained through GTA,

utilizing India Harmonized Tariff Schedule ("HTS") line 7208.51.10, the tariff category for "flat-

rolled products of iron or non-alloy steel, of a width of 600 mm or more, hot-rolled, not clad,

plated or coated, other, not in coils, not further worked than hot rolled: of a thickness exceeding

10 mm: plates."[4]  I&D Memo at 7.  Commerce based its decision to use the GTA data on the fact

that the data were contemporaneous, from the primary surrogate country (India), from an HTS

category that includes the relevant grades of steel plates (S355K2, S355J2, and S355NL), net of

taxes and duties, and publicly available.  Id. at 9.  Commerce, however, recognized that the HTS

category it chose also covered grades of steel plate other than S355, but it found the data

proffered by CS Wind to be more problematic for a variety of reasons, including lack of

specificity, lack of complete data, lack of broad market averages, and lack of economic

---

[2](...continued)
steel plate between $0.68/kg and $0.89/kg during the period of investigation ("POI").  See Pl. Br.
Ex. 1; I&D Memo at 10.  Commerce's surrogate value based on the GTA data was $1.20/kg.  See
I&D Memo at 10.

[3] These data sets included Metal Expert India (import), Infodrive India, MEPS (non-
India), SBB, Metal Expert Ukraine/Russia, GTA Ukraine (import), Steel Orbis Ukraine (export),
GTA India (export), and Steel Prices Europe.  See CS Wind First SV Submission, Exs. 3A, 3B,
3E, 3F; CS Wind Post-Preliminary SV Submission, Exs. 1E, 1F, 1H, 1I, 1J, 1K; WTTC
Resubmission of Post-Preliminary Rebuttal SV Information, Ex 5 at bar code 3099084-04 (Sept.
28, 2012), ECF No. 28-9 (Aug. 9, 2013).

[4] WTTC also disputed Commerce's decision to utilize HTS 7208.51.10, but not the use of
GTA data generally.  See I&D Memo at 2–4.  Commerce rejected WTTC's arguments that this
was the improper tariff heading, id. at 7, and WTTC did not file suit challenging that
determination by Commerce.  Accordingly, the court will not examine the reasonableness of that
aspect of the surrogate value determination.  See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)
("The grounds upon which an administrative order must be judged are those upon which the
record discloses that its action was based.").

comparability.  See id. at 9–15.

      In its motion for judgment on the agency record, CS Wind argues that at least

some of these data points should have been considered as alternate bases for calculating a

surrogate value, while others should have served as evidence that Commerce's chosen surrogate

value is aberrational.  Pl. Br. 10–27.  After considering the record concerning each proposed data

point, the court concludes that Commerce acted unreasonably in dismissing many of the

proposed data points, at least for the reasons asserted by Commerce.  Each of these data sources

is discussed below based on the reasons for their rejection before turning to the question of

whether Commerce's selection of the GTA data as the best available information was supported

by substantial evidence.  In analyzing the various sources, the court takes into account

Commerce's reasoning for accepting and selecting the GTA data as the best available

information, including ensuring consistency of the agency's position from case to case.

      A.     Proposed Data Sources

      1.     Steel India

      Commerce rejected the Steel India data because they did not include the identical

grades of steel actually used by CS Wind, dismissing arguments that Commerce should consider

data for equivalent or comparable grades of steel plate.  I&D Memo at 10–11.  CS Wind claims

that the domestic prices from Steel India encompass exclusively grade IS 2062 steel, which is an

equivalent grade of steel also used to produce wind towers.[5]  Pl. Br. 21; CS Wind Pre-

---

[5] Outside of WTTC's rejected claim that S355 steel is high-strength low-alloy steel, no
party appears to have challenged before the agency the record evidence submitted by CS Wind
purportedly showing that S355 steel is equivalent to other steel used in wind towers, such as IS
2062 steel.  See I&D Memo at 8–9; see, e.g., CS Wind Post-Preliminary SV Submission, Ex. 3E

      (continued...)

Preliminary Comments, Ex. 3; CS Wind Post-Preliminary SV Submission, Ex. 3E at 2; CS Wind

Case Brief at 12 n.6, bar code 3099703-01 (Oct. 3, 2012), ECF No. 27-11 (Aug. 8, 2013).  As

discussed further below in comparing the GTA and Steel India data, the prices of equivalent

products are at least relevant to calculating a surrogate value for an input, especially when no

data source provides prices exclusively, or even largely, for the precise input used to manufacture

the subject goods.  Based on the record before the court, Commerce acted unreasonably in

declining to consider the Steel India prices.  Therefore, the court remands to Commerce for

reconsideration of the Steel India data in calculating a surrogate value for steel plate.

2.      JPC

Commerce rejected the JPC data because they were not representative of the entire

POI due to a missing month of data.  I&D Memo at 11.  CS Wind challenges Commerce's

rejection of the JPC data, claiming that the five months of accurate data covered substantially all

of the six-month POI.  Pl. Br. 20–21.  The court has held previously that data with minor defects

cannot be summarily rejected by Commerce, particularly where the data is submitted for the

purpose of showing that Commerce's selected data is aberrational.  See Xinjiamei Furniture

(Zhangzhou) Co. v. United States, Slip Op. 13-30, 2013 Ct. Int'l Trade LEXIS 34, at *23 (CIT

Mar. 11, 2013) (remanding for Commerce to consider data set for corroboration purposes even

though the data covered only ten of the twelve months of the period of review).  Accordingly,

---

[5](...continued)

at 2 (identifying A36 and IS 2062 as wind tower steel).  One chart placed on the record by
WTTC shows IS 2062 steel labeled as structural steel plate while S355 is labeled as high tensile
plate.  See WTTC Pre-Preliminary Comments on Steel Plate, Ex 1, PR 252–54 (July 9, 2012),
ECF No. 36-1 (Nov. 27, 2013).  In another document submitted by WTTC, however, S355 is
described as structural steel, as IS 2062 is.  See WTTC Response to CS Wind's SV Comments,
Ex. 1, PR 148 (May 23, 2012), ECF No. 36-1 (Nov. 27, 2013).

although Commerce may have some legitimate basis for rejecting the JPC data as a primary

source for surrogate values, it was unreasonable for Commerce to reject the data entirely in

considering whether the GTA data is aberrational.  Therefore, the court remands to Commerce

for reconsideration of the JPC data at least for corroboration purposes, if not more.

3.      Steel Mint

Steel Mint data were rejected because they were based on prices from a single day

during the POI.  I&D Memo at 11–12.  CS Wind simply asserts that the Steel India, Steel Mint,

MEPS, and Metal Expert India data all corroborate the JPC data and each other.  Pl. Br. 21.  CS

Wind, however, fails to contest directly the deficiency that Commerce found with the Steel Mint

data.  Because Commerce must reconsider its chosen surrogate value, it may consider these data,

or not, on remand.

4.      MEPS India

Commerce refused to use the MEPS India data because the reported prices for

several months were the same, despite other evidence that prices fluctuated during the POI, and

because the data were not representative of a broad market average.  I&D Memo at 12.  As with

the Steel Mint data, CS Wind makes no substantive arguments to the contrary.  Because

Commerce must reconsider its chosen surrogate value, it may consider these data, or not, on

remand.

5.      Steel Chamber

Commerce dismissed the Steel Chamber Weekly prices because they were not

representative of a broad market average.  Id. at 11.  CS Wind challenges the rejection of the

Steel Chamber data but does not dispute that the data were not representative of a broad market

average.  See Pl. Br. 21.  Instead, CS Wind criticizes Commerce's reliance on this criteria

because Commerce's finding that prices varied across markets was supported by data (JPC and

Steel India) that Commerce already had rejected for other reasons.  See id.  Because the court has

found the complete rejection of the Steel India and JPC data to be unreasonable, at least for the

reasons given by Commerce, how these data will be treated on remand may affect the use of the

Steel Chamber data, and therefore reconsideration of these data is warranted on remand.

6.        MEPS Non-India

Commerce criticized the MEPS data for non-Indian markets because those

countries were not identified as economically comparable to Vietnam and because the range of

thicknesses did not encompass all of the steel plates used by CS Wind.  I&D Memo at 12.

CS Wind's challenge to the exclusion of the MEPS non-India data as benchmarks

has merit.  The court recently held that "while the [proposed benchmark] prices might not satisfy

the requirements for surrogate values, they are sufficient to call into question the reliability of the

GTA data," even when from non-economically comparable countries.  Xinjiamei, 2013 Ct. Int'l

Trade LEXIS 34, at *21–22.  The GTA import data used by Commerce are based largely on

imports from European countries, including some of the countries covered by the MEPS data, see

Surrogate Values for the Preliminary Determination, Ex. 2 at bar code 3089133-02 (July 26,

2012), ECF No. 28-3 (Aug. 9, 2013), and therefore, these benchmarks are relevant in determining

whether the international market prices reflected in the MEPS data for the grade of steel plate at

issue, or its equivalent, render the GTA import data price aberrational.

Similarly, Commerce's rejection of the MEPS data based on thickness appears

inconsistent with its selection of the GTA data.  The MEPS data cover the vast majority of the

thicknesses of steel plate used by CS Wind, with the remainder falling outside the range by one

millimeter.  See CS Wind Verification Exhibit 18I at 2, bar code 3094071-01-07 (Sept. 21,

2012), ECF No. 27-13 (Aug. 8, 2013); CS Wind First SV Submission, Ex. 3F.  In choosing to

rely on the GTA data, which include a wide range of plates both significantly thicker and thinner

than the plate used by CS Wind, Commerce implicitly accepted WTTC's argument that thickness

is not a determinative factor in calculating the price per kilogram of steel plate.  See HTS

7208.51.10 (covering steel plate with a thickness greater than 10 mm); WTTC Rebuttal Brief at

22–26, bar code 3100546-01 (Oct. 9, 2012), ECF No. 27-11 (Aug. 8, 2013).  After reaching such

a conclusion for the GTA data, Commerce may not reasonably reject the MEPS data on this basis

without further explanation.  Accordingly, the MEPS non-India data is remanded to Commerce

for reconsideration.

### 7.      Metal Expert India

Metal Expert India data were not used because Commerce could not determine if

the prices reflected broad market averages and because the import data included imports from an

NME.  I&D Memo at 12–13.  CS Wind asserts that the Steel India, Steel Mint, MEPS, Metal

Expert India, and JPC data all corroborate each other but fails to contest directly any of the

deficiencies that Commerce found with the Metal Expert India data.  See Pl. Br. 21.  Given the

overall deficiencies in Commerce's rejection of data sets, Commerce may reconsider this

evidence, or not, on remand.

### 8.      Metal Expert non-India

Metal Expert data for other countries were rejected because those countries were

not economically comparable.  I&D Memo at 13.  The court remands this determination for the

same reason given for the MEPS non-India data.

> 9.      SBB

SBB pricing was rejected because it provided prices on a quarterly basis only and could include NME or subsidized prices.  Id.  Additionally, the SBB data regarding Turkey were not for an economically comparable country, not based on broad market averages, and did not show how prices were determined.  Id.  Although Commerce's rejection of the data for lack of economic comparability was erroneous, for the same reasons as the rejection of the MEPS non-India data, CS Wind has not challenged the other reasons for which the SBB data set was excluded, including the lack of frequent price reporting and the possible taint of NME/subsidized imports.  Therefore, the determination with respect to the SBB data is remanded to Commerce to reconsider whether the data should continue to be rejected based on these unchallenged deficiencies, or whether it should be used for some purpose in this inquiry.

> 10.     Steel Orbis Ukraine Export

The Steel Orbis Ukraine Export data were rejected because they were not from an economically comparable country, might have included value added tax, and may have used different tariff headings.  Id. at 14.  As with the MEPS non-India data, CS Wind's challenge based on economic comparability has merit.  CS Wind, however, has not responded to Commerce's concerns regarding the latter two reasons for rejection.  Commerce should reconsider on remand whether rejection of the data is still warranted based on these alternate grounds or whether the data should be used for some purpose in this inquiry.

> 11.     GTA India Export

GTA India Export data were not used because of prior findings that Indian export

prices were affected by export subsidies.  Id.  CS Wind has not argued that this determination

was unsupported or contrary to law.  Whether Commerce has some use on remand for these data

is for Commerce to decide.

>       12.     Steel Price Europe ("Steel Guru")

Steel Price Europe data were not used because the steel plate thickness range was

not broad enough to cover all of the plate used by CS Wind and because some of the prices did

not cover the exact grade of steel plate used by CS Wind.  Id. at 15.  Finally, Steel Price Europe

data for Belgium were disregarded because it was unclear how the data were gathered.  Id.

At least some of CS Wind's challenges to this determination have merit.  As the

court discussed in the context of the MEPS non-India data, in selecting the GTA data, Commerce

made a decision that thickness was not a decisive factor in valuing steel plate, impliedly

accepting WTTC's argument that steel of a particular grade is valued at the same per kilogram

price across thicknesses.  Similarly, as discussed in the context of the Steel India data, rejection

based on a difference in grade is inappropriate if CS Wind's submissions demonstrate that the

goods are equivalent.

CS Wind cites to Exhibit 1A of the CS Wind Post-Preliminary SV Submission to

support its claim that Commerce also acted unreasonably in concluding that the record did not

provide evidence that the Steel Guru Belgium data were based on broad market averages.  Pl. Br.

25.  This document, however, explains only that Steel Guru India prices are collected from ten

different markets to ensure the prices reflect broad market averages.  See CS Wind Post-

Preliminary SV Submission, Ex. 1A.  CS Wind, however, has not pointed to evidence explaining

whether this practice is carried over to price research in other markets or, more specifically, what

Steel Guru's practices are with respect to Belgian steel prices.  In reviewing the record as a

whole, the court has been unable to locate such evidence.  Instead, the relevant letter from Steel

Guru simply explains that the publicly available prices are for S235 and S355 grade non-alloy

steel plate during the POI, exclusive of duties and taxes.  Id. at Ex. 1J.  The attached chart

references a single port, Antwerp.  See id.  That said, it is unclear to the court whether this would

matter in the context of a fairly small country like Belgium with limited ports.  Accordingly, for

the various reasons described above, Commerce should reconsider this determination as well on

remand.

13.     Infodrive India

CS Wind also challenges Commerce's apparently inconsistent use of Infodrive

India data in its Final Determination.  Pl. Br. 18–19, 23–24.  Commerce relied on this data set,

submitted by WTTC, for several purposes, including to show the GTA data contained actual

imports of  S355 grade steel plate and to demonstrate that prices of steel varied over time during

the POI.  See I&D Memo at 10–11.  Commerce, however, rejected the use of the same data when

used by CS Wind to show that most imports of S355 grade plate in the GTA data cost the same

as the plates covered by CS Wind's proffered data sets, that S355 makes up a very small portion

of the total imports of steel plate falling within the chosen basket tariff classification, and that

other imports in the basket included grades of steel plate not used in wind tower production.  See

id. at 6.  The court has held previously that corroboration data, including Infodrive data in

particular, need not meet the same standards as data offered to calculate surrogate values in order

to be relevant for Commerce to consider.  See Dorbest Ltd. v. United States, 30 CIT 1671, 1698,

462 F. Supp. 2d 1262, 1286 (2006) ("Regardless of whether or not Commerce finds it

appropriate to use the Infodrive India data to value mirrors, the Infodrive India data can prove to

be illuminating as to the nature of the product actually being valued within a specific (and in this

case basket) HTS subheading."); see also Calgon Carbon Corp. v. United States, Slip Op. 11-21,

2011 Ct. Int'l Trade LEXIS 21, at *27–28 (CIT Feb. 17, 2011) ("Commerce must consider

InfoDrive if it covers a definite and substantial percentage of overall imports. . . . Where

InfoDrive data is placed on the record to impeach as opposed to corroborate Commerce's

determination, a lower threshold may exist."). But see Dorbest Ltd. v. United States, 32 CIT 185

198–99, 547 F. Supp. 2d 1321, 1333 (2008) (accepting Commerce's complete rejection of

Infodrive data based on substantially incomplete reporting of imports and inconsistent units of

measure).

      Here, Commerce's exclusion of the Infodrive data raises more basic questions

than those addressed in Calgon Carbon and Dorbest because Commerce chose to rely on the data

for some purposes but not others, without providing any rationale for why the data was reliable

for only the selected purposes.  Thus far, Commerce's explanation for this inconsistency in its

use of the Infodrive data is inadequate, and unless it has a heretofore unstated rational

explanation, it must consider the data to the extent they both support and detract from

Commerce's chosen surrogate value.  As the court must in evaluating the record evidence,

Commerce also "must consider the record as a whole, including evidence that supports as well as

evidence that fairly detracts from the substantiality of the evidence."  Nucor Corp. v. United

States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1332 (2008) (internal quotation marks omitted),

aff'd, 601 F.3d 1291 (Fed. Cir. 2010).  Accordingly, Commerce may not rely on Infodrive data

when they support Commerce's determination but then reject the data when they detract from

that conclusion, at least without a substantial reason.

With respect to all of the alternative data sources, the court will not decide at this point which Commerce should accept or reject and for which purposes. Commerce's determination at a minimum gives the appearance that it has pre-determined that the GTA data must be used and any data contradicting it must be rejected, for good reason or bad. Of course, this is not acceptable. If Commerce has good reasons for rejecting a data set for some purpose, it must say so clearly on the record.

B.      Best Available Information

Having found that Commerce impermissibly disregarded many of the data sets proffered by CS Wind for either valuation or corroboration purposes, at least based on the reasons provided in the I&D Memo, the court turns now specifically to how this error infected Commerce's selection of the best available information for valuing steel plate. CS Wind attacks the GTA import data as not sufficiently product specific because 96 percent of the import data under the basket tariff heading cover steel not of the relevant grade (S355). Pl. Br. 22. CS Wind claims that the domestic prices from Steel India, by comparison, encompass exclusively an equivalent grade of steel plate that is also used to produce wind towers. Id. at 21; CS Wind Case Brief at 12 n.6; WTTC Pre-Preliminary Comments on Steel Plate, Ex. 1. By contrast, CS Wind contends that there is no evidence that the non-S355 steel included in the GTA import data is equivalent to S355, as the basket covers all grades of non-alloy hot-rolled steel greater than a certain thickness. See HTS 7208.51.10; Pl. Br. 22. Furthermore, CS Wind argues that the Steel India data are more specific than the GTA data because they separately report prices for a variety of plate thicknesses corresponding to the thicknesses actually used by CS Wind in producing the

subject wind towers.  Pl. Br. 22.  Commerce summarily rejected the notion that it should even

consider comparable or equivalent grades of steel in setting a surrogate value for the steel plate

used by CS Wind.  See I&D Memo at 10–11.

      Although in the abstract Commerce's preference for prices of identical

merchandise over comparable/equivalent merchandise would be reasonable, in this case its

choice purportedly based on that preference is not.  Here, Commerce has selected the GTA data

as the best available information, despite at least some evidence that 96 percent of the steel

falling within the selected basket tariff heading is not of the same grade as the steel used by CS

Wind.  See WTTC Resubmission of Post-Preliminary Rebuttal SV Information, Ex 5; CS Wind

Case Brief at 22.  It is unclear what portion of this 96 percent could be considered equivalent or

comparable because Commerce never made such a finding on the record.  Commerce also never

addressed the question of how accurate the 96 percent figure even is, based on the completeness

of the Infodrive data, assuming instead that the data accurately demonstrated some imports

(approximately 4 percent) were S355 steel while discounting without explanation evidence

demonstrating the converse proposition.  As a result, the court is left to review Commerce's

choice between 1) a set of prices 96 percent of which purportedly correspond to steel that is

similar to but not necessarily comparable to the steel plate at issue and 2) a set of prices based on

the specific thickness of steel and a purportedly equivalent grade of steel.  This choice is also in

the context of other data sets that Commerce must reconsider on remand, which, if accepted,

closely corroborate the Steel India data but differ significantly from the GTA data.  Commerce's

choice here in selecting the GTA data is akin to valuing a red onion not based on the prices of

yellow or white onions but based on the prices of a basket of all root vegetables, simply because

one red onion is in the bushel.  Assuming equivalence of steel grades for the Steel India data,

which Commerce did not address, it is perplexing how any reasonable mind could consider the

first data set the best available information on the record, even when giving priority to the grade

of steel over the thickness of steel.

In view of the above analysis, the court must remand to Commerce to choose an

appropriate surrogate steel value or explain its reliance on the GTA data as the "best available

information" for valuing the steel plate used by CS Wind in producing wind towers.  The

explanation that there is a small amount of identical merchandise in the GTA category it chose is

not substantial evidence to support Commerce's current choice.

## II.      Valuation of Carbon Dioxide

In addition to challenging the surrogate value assigned to steel plate, CS Wind

argues that Commerce erred in its valuation of CS Wind's carbon dioxide ("CO2") gas input.  Pl.

Br. 53–56.  Commerce again relied upon GTA Indian import data, using the tariff heading for

"carbon dioxide: other," HTS 2811.21.90.  I&D Memo at 45–46.  Commerce rejected CS Wind's

suggestion that it instead utilize the prices contained in the financial statements for SICGIL

Indian Ltd. ("SICGIL"), an Indian producer of CO2 gas.  See id.  Commerce found that although

the SICGIL data are "reflective of the primary surrogate country, specific to the input in question,

and net of taxes and import duties, [Commerce was] not able to determine . . . whether or not the

SICGIL price data is representative of a broad market average."  Id. at 46.  Commerce further

faulted the data for not being contemporaneous with the POI, as they were based on the April 1,

2010–March 31, 2011 financial statement.  Id. at 45–46.  Although recognizing that the GTA

data were less specific, as they included all forms of CO2 besides dry ice, Commerce found the

GTA data met all of the other criteria it considers in evaluating potential surrogate values.  Id. at

46.

In its motion, CS Wind claims that Commerce's decision is not supported by

substantial evidence because SICGIL's data are representative of a broad market average and that

Commerce's preference for contemporaneity and broadness over specificity was contrary to

Commerce's practice and relevant law.  Pl. Br. 53–56.  The government responds that Commerce

acted reasonably and in accordance with law because the GTA data satisfied all of Commerce's

surrogate value criteria while the SICGIL data were deficient.  Def. Br. 22–25.  WTTC similarly

claims that Commerce's selection of the less-specific GTA data was reasonable because of the

noted deficiencies in the SICGIL data.  WTTC Br. 51–53.

In reviewing the pages of SICGIL's financial statement cited by CS Wind, it is

clear that SICGIL is a sizeable producer of CO2, producing 31,381 metric tons of CO2 during the

reported year.  See CS Wind Post-Preliminary SV Submission, Ex. 6E at 24.  As noted by CS

Wind at oral argument, this quantity is more than twice[6] the annual quantity of all CO2 imports

in the relevant tariff category, according to the GTA data relied upon by Commerce.  See

Surrogate Values for the Preliminary Determination, Ex. 4-2.  Although volume alone may not

be enough to demonstrate that the prices represented broad market averages, it does not appear

that Commerce considered and addressed this argument in the I&D Memo.  On the other hand,

Commerce correctly found that the data is not contemporaneous with the POI.  Because,

---

[6] Because Commerce excluded imports from South Korea and other countries, the actual
volume of imports upon which the GTA data is based was reduced from 6,752 metric tons to
only 3,389 metric tons, a tenth of the SICGIL data.  See Surrogate Values for the Preliminary
Determination, Ex. 4-2.

however, Commerce based its rejection of the SICGIL data on both broadness and

contemporaneity concerns, and because Commerce failed to address evidence significantly

detracting from its finding with respect to one of these criteria, the court remands to Commerce

for it to consider CS Wind's argument regarding the relative size of SICGIL within the Indian

CO2 market and to reweigh the evidence underlying its choice.

### III.    Allocation of Civil/Erection Income and Expenses

CS Wind contends that Commerce erred in rejecting its ministerial error

allegation regarding the allocation to overhead of certain income and expenses in Ganges

Internationale's ("Ganges") financial statement.  Pl. Br. 27–31.  In its Final Determination,

Commerce accepted CS Wind's proposal to use Ganges's financial statement in calculating

surrogate financial ratios, including overhead expenses, selling and general expenses, and profit.

See I&D Memo at 15–16; see also 19 U.S.C. § 1677b(c)(1), (3), (4).  In doing so, Commerce also

accepted WTTC's argument that it should treat the line item for jobwork charges in the financial

statement as part of overhead because direct labor and energy expenses were reported as separate

line items already.  I&D Memo at 26.  Without explanation, however, Commerce did not accept

WTTC's concession that the erection income and civil income line items in the same financial

statement also should be included as offsets to overhead.  See id.; Final SV Memo at 4–5, bar

code 3111181-01 (Dec. 17, 2012), ECF No. 28-9 (Aug. 9, 2013).

Commerce then rejected CS Wind's ministerial error allegation concerning this

calculation, asserting that the allocation was an intentional methodological choice[7] because

_____

[7] Although this issue was presented to Commerce in the form of a ministerial error
allegation, see 19 C.F.R. § 351.224 (2012), none of the parties have briefed it in this manner
(continued...)

Commerce "normally includes only miscellaneous income items as an offset to the surrogate

financial ratios." Ministerial Error Memo at 2–3 (citing Lightweight Thermal Paper from the

People's Republic of China: Final Determination of Sales at Less than Fair Value, 73 Fed. Reg.

57,329 (Dep't Commerce Oct. 2, 2008)).  Commerce determined that the erection and civil

income line items did not meet this criteria and excluded them from the financial ratios.  Id. at 3.

CS Wind asserts that this explanation is unreasonable in view of the description of jobwork

charges in the financial statement as "including Erection and Civil Expenses."  CS Wind Request

to Correct Clerical Errors, Ex. 1 at 5.  Once Commerce made the determination that jobwork

(including erection and civil expenses) was a miscellaneous expense, CS Wind contends

Commerce then was required to consider the related income lines as miscellaneous income to be

used as an offset.  Pl. Br. 27–31.  The government argues that Commerce did not err in rejecting

the ministerial error allegation because Commerce "cannot go behind financial statements in

determining the appropriateness of including an item in the financial ratio calculations," and

accordingly, Commerce could not determine here whether erection and civil income were related

directly to "jobwork charges."  Def. Br. 36 (citing Issues and Decision Memorandum for the

2008–2009 Administrative Review of Chlorinated Isocyanurates from the People's Republic of

China, A-570-898, at cmt. 5 (Nov. 10, 2010), available at

http://enforcement.trade.gov/frn/summary/prc/2010-29020-1.pdf (last visited Mar. 20, 2014)).

WTTC argues that "CS Wind assumes incorrectly that similarly titled expenses and income are

---

[7](...continued)
before the court.  Because Commerce applied this intentional methodological choice for the first
time in the Final Determination, without notice, CS Wind is permitted to challenge Commerce's
determination directly in the first instance here.  See Lifestyle Enter. v. United States, 768 F.
Supp. 2d 1286, 1313 n.39 (CIT 2011).

automatically related."[8]  WTTC Br. 33 (contending that there is no record evidence directly

linking the income and expense lines in question).

         CS Wind does not challenge Commerce's practice of including only

miscellaneous income lines in overhead, but it contends that Commerce failed to follow its

acknowledged practice of offsetting expense line items associated with the general operations of

the company with related income lines.  Pl. Br. 28–29 & n.7 (citing Chlorinated Isocyanurates

from the People's Republic of China: Final Results of 2008–2009 Antidumping Duty

Administrative Review, 75 Fed. Reg. 70,212, cmt. 5 (Dep't Commerce Nov. 17, 2010);

Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final

Determination of Sales at Less than Fair Value, 73 Fed. Reg. 55,039, cmt. 3 (Dep't Commerce

Sept. 24, 2008); Notice of Final Determination of Sales at Less than Fair Value and Negative

Final Determination of Critical Circumstances: Certain Color Television Receivers from the

People's Republic of China, 69 Fed. Reg. 20,594, cmt. 18 (Dep't Commerce Apr. 16, 2004)).

The only question then is whether Commerce reasonably could determine that "Erection income"

and "Civil income" were unrelated to the "Jobwork Charges (including Erection and Civil

Expenses)" described in a single financial statement.  CS Wind Request to Correct Clerical

Errors, Ex. 1 at 1, 5.  Because Commerce does not look beyond the face of the financial

statement to interpret these line items, its decision that the identical terms were not related,

despite the seemingly contrary text of the financial statement, is unsupported by substantial

---

         [8] Interestingly, this argument is contrary to the argument that WTTC made in its last brief
before the Final Determination in which it advocated for both the jobwork expenses and the civil
and erection income lines to be included in the overhead calculation, acknowledging that they
were linked.  See WTTC Rebuttal Brief at 61.

evidence.[9]  As a result, the jobwork charges and the associated income lines must be treated

similarly under Commerce's practice, either including both as overhead or excluding both from

the calculation, unless Commerce explains why different treatment is warranted.  Accordingly,

this issue is remanded to Commerce for reconsideration and/or further explanation.

**IV.      Weight Discrepancy and Adjustment**

CS Wind also asserts that Commerce's decision to account for the discrepancy

between the Packed Weight of its merchandise and the weight it reported for the material FOPs

was unsupported by substantial evidence and contrary to law.  See Pl. Br. 40–46.  Although the

court finds that Commerce's adjustment to normal value based on the weight discrepancy was

supported by substantial evidence, the resulting adjustment to the U.S. sales price was not.

A.      Weight Discrepancy

Early on in its investigation, Commerce noticed that the total net weight of all of

the FOPs CS Wind had reported was significantly less than the total Packed Weight CS Wind

had reported for its wind towers.  See Surrogate Values for the Preliminary Determination at 6;

Preliminary Analysis Memo at 8, CR 213 at bar code 3089102-01 (July 26, 2012), ECF No. 42-9

(Dec. 11, 2013).  As a result, Commerce requested that CS Wind reconcile the difference in

weights on multiple occasions.  See, e.g., May Supplemental Questionnaire at 15, PR 128 at bar

code 3075213-01 (May 9, 2012), ECF No. 43-1 (Dec. 11, 2013).

CS Wind responded that the difference in the two weights occurred because the

---

[9] WTTC notes in its brief that the combined erection income and civil income line items
are less than the total for jobwork charges, supporting its new argument that the items are
unrelated.  See WTTC Br. 33.  Commerce did not mention this as a reason for its determination,
and therefore, the court will not consider this alternate justification at this juncture, although the
agency may wish to explore it on remand, along with CS Wind's explanation for the difference.

Packed Weight was based on theoretical weights of all the inputs plus the weights of

packing/transportation equipment.  See CS Wind July 18, 2012 Submission at 2–3, CR 206–08 at

bar code 3087123-01 (July 18, 2012), ECF No. 42-9 (Dec. 11, 2013).  CS Wind claimed that the

FOP weights were drawn from the actual weights of the inputs with no additional

packing/transportation equipment weight added.  Id. at 3.  The Packed Weight, CS Wind alleged,

was calculated solely for purposes of determining the center of gravity of the tower portions in

order to stack the towers on the ship in such a way that they would not roll in transit.  I&D Memo

at 28.  Thus, these weights were much less accurate than the FOP weights.  CS Wind July 18,

2012 Submission at 3.

During verification, Commerce was "not able to observe the actual receipt and

withdrawal of raw materials, the entry of raw materials into the production processes, the packing

process, or receipt and subsequent release of finished goods from inventory."  Verification

Report at 14, bar code 3097980-01 (Sept. 21, 2012), ECF No. 27-11 (Aug. 8, 2013).  As a result,

Commerce could not confirm whether the weights of the reported FOPs were accurate by

weighing the individual inputs used in the towers or weighing the final product.  Commerce also

could not determine whether the reported consumption quantities of any FOPs matched the FOPs

actually incorporated in the final product.  Instead, Commerce continued to rely at that point on

the weights and consumption quantities reported by CS Wind, which were either derived or

theoretical values taken from documentation provided by suppliers or customers (test certificates,

packing lists, bills of material, specifications, etc.).  See, e.g., id. at 17, 34, 38–40.  At

verification, Commerce also confirmed that the Packed Weight was based on center-of-gravity

calculations created to ensure the wind towers did not roll over in transit.  See id. at 47.

Commerce, thus, was faced with an unclear record as to what was the correct weight of a finished tower — one based on the FOP weight or one based on the Packed Weight. In its Final Determination, Commerce decided that it was "unreasonable to assume that the weight of the wind tower section recorded in the packing lists is so grossly overestimated as to chance the misplacement of the wind tower section on a shipping vessel and risk an imbalance of the vessel or rolling of the tower section in transit." See I&D Memo at 31. Commerce adopted the Packed Weight as the correct measure based on its link to real world choices. See id. at 32. The discrepancy in the weights, however, meant CS Wind had either underreported its consumption of FOPs or had not reported certain factors. In particular, as the weights for the flanges, door frames, and steel plates corresponded between the Packed Weight and FOP weights, Commerce determined that the consumption of the internal components was underreported. See id. at 33. To compensate for this, Commerce applied the weighted-average surrogate value of all internal components to the difference between the weights and included the resulting adjustment in its calculation of normal value. Id. at 33.

Generally, when "faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information." Dorbest Ltd. v. United States, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277 (2006). In this case, Commerce reasonably could have accepted the FOP weight or the Packed Weight as the actual weight of the towers. Because there was a gap in the record, Commerce permissibly looked to "facts otherwise available" to account for the discrepancy by accepting the Packed Weight as the actual weight and then increasing the normal value based on the weighted-average surrogate value for internal components, as that was where the weight discrepancy arose. See 19

U.S.C. § 1677e(a); I&D Memo at 32–33.  The "facts otherwise available" to Commerce

demonstrated that although the Packed Weight might not be an exact measure of the actual

weight, based on its actual use, the Packed Weight was likely at least as accurate as the FOP

weight, which also was based on theoretical or derived weights drawn from information provided

by CS Wind's customers or suppliers.[10]  See, e.g., Verification Report at 47–48.

      Additionally, Commerce requested that CS Wind explain the weight discrepancy

on numerous occasions, requests which were met with responses that the Packed Weight was

merely a theoretical value calculated by CS Wind's customer.  See CS Wind July 18, 2012

Submission at 3.  CS Wind responded in this manner despite the importance that CS Wind places

on the Packed Weight's accuracy in the normal course of business along with the fact that the

Packed Weight was traced back to a packing list prepared by CS Wind.  See Verification Report

at 47.  Thus, in choosing the Packed Weight and deciding to adjust for differences between the

data choices, Commerce acted reasonably in filling the gap in the record by using the facts

available to it.

      B.    Amount of Adjustment to U.S. Sales Price

      Although Commerce permissibly made an upward adjustment to normal value

based on the weight discrepancy, its resulting upward adjustment to the U.S. sales price was

erroneous.

---

[10] To some extent, CS Wind's arguments about whether the FOP weights associated with internal components were "actual" weights and whether such weights were verified by Commerce are red herrings.  Commerce's determination was not based on a finding that the per-unit weight of any of the FOPs was incorrect or falsified.  Instead, Commerce based its adjustment to normal value on its finding that the consumption of internal components was underreported, resulting in a discrepancy in the reported weight of the finished product, which could not be tested during verification.

CS Wind incorporated into its wind towers certain free-of-charge internal components provided by its customers.  See I&D Memo at 53.  Because these inputs were a factor in the production of the towers, Commerce valued the parts just as it did with any other material FOP.  Id.  As CS Wind did not actually pay for these parts, it of course did not charge the customers that supplied the components to CS Wind.  Therefore, the value of the free-of-charge components was not reflected in the U.S. sales price.  In order to offset the increase in the normal value caused by adding in the value of the free-of-charge components, Commerce adjusted the U.S. sales price upwards by the same amount it had added for these components to the normal value.  Id.

As explained above, in its Final Determination, Commerce further adjusted normal value to account for the weight shortfall in reported FOP input weights.  Id. at 29.  As this adjustment assumed that consumption of both purchased internal components and free-of-charge internal components was underreported, the adjustment was based on the combined weighted-average surrogate value of all inputs, both purchased and free-of-charge.  Id. at 29 & n.163.  In an effort to continue to account for the value of the free-of-charge components included in the normal value calculation, Commerce attempted to make an additional upward adjustment to the U.S. sales price.  Id. at 29.  To accomplish this, Commerce determined the percentage by weight by which all internal components were underreported.  See Final Calculation Analysis at 4–5, 7–8, bar code 3111172-01 (Dec. 17, 2012), ECF No. 27-12 (Aug. 8, 2013).  Commerce then used this percentage to calculate the weight by which the free-of-charge components were underreported.  Id. at 8.  Commerce finally multiplied that weight by the combined weighted-average surrogate value of all internal components, both purchased and free-of-charge.  Id.  This

amount was then added to the U.S. sales price.  Id.

CS Wind filed a ministerial error allegation, claiming that Commerce mistakenly multiplied the weight shortfall for the free-of-charge components by the combined weighted-average surrogate value for all internal components, instead of by the weighted-average surrogate value for only the free-of-charge components.  CS Wind Request to Correct Clerical Errors at 8–11.  Commerce rejected the allegation, claiming that its adjustment was based on an intentional methodological choice.  Ministerial Error Memo at 3.  CS Wind continues its challenge before the court, claiming that the adjustment is unsupported by substantial evidence and not in accordance with law.  Pl. Br. 46–49.  The government contends that Commerce's adjustment was reasonable because it was a quantity rather than a value adjustment.  Def. Br. 45–48.  The government explains that Commerce was unable to determine the portion of the weight discrepancy attributable to purchased versus free-of-charge components.  Id. at 47.  This is why Commerce adjusted normal value based on the weighted-average value for all components and used the same value when adjusting the U.S. sales price.  Id.

It is important to keep in mind that Commerce's sole purpose in adjusting the U.S. sales price essentially was to cancel out the impact of including the free-of-charge components on the normal value side of the AD comparison.[11]  See I&D Memo at 53.  Therefore, the weight-discrepancy adjustment made to the U.S. sales price was intended to cancel out the effect of the free-of-charge components being included in the normal value equation.  The court does not

---

[11] The court notes that Commerce's original adjustment did not completely accomplish this goal because the value associated with the components was incorporated into calculations for financial ratios.  See I&D Memo at 53–54.  Although CS Wind challenged this aspect of the adjustment below, see id., it did not raise this argument in its brief before the court.

understand the government's response that Commerce's adjustment was one based on weight and

not value, as CS Wind's argument does not seem to hinge on this distinction.  The formula used

for FOP value (with the weight adjustment) could be written as follows, although this appears in

a slightly different mathematical form[12] from that reported by Commerce:

FOP Material Value = (ExtW x ExtSV) + (IntW x IntSV) + (FreeW x FreeSV) + (WD% x IntW x IntSV) +
                                   (WD% x FreeW x FreeSV)[13]

Replacing the variables with fictitious, arbitrary figures, the formula could be written as:

FOP Material Value = (500 x 0.15) + (100 x 0.1) + (100 x 0.2) + (50% x 100 x 0.1) + (50% x 100 x 0.2)

In order to counter the effect of including the free-of-charge components in the

weight adjustment to normal value, as Commerce explained it intended, the final term in the

formula (WD% x FreeW x FreeSV), or applying the fictitious values, (50% x 100 x 0.2) = 10,

simply needed to be included in the calculation for U.S. price.  Instead Commerce used the

following additions to the U.S. sales price: WD% x FreeW x (the combined weighted-average

surrogate value for all internal components, both free-of-charge and purchased), which can be

---

[12] The only difference between the formula presented below and the one used by Commerce is that Commerce first calculated a combined weighted-average surrogate value for both the purchased and free-of-charge internal components.  See Final Calculation Analysis at 4–5.  It then multiplied this by the weight discrepancy.  Id. at 5.  The formula included herein simply distributes out this adjustment to assist the reader in understanding the effect of this adjustment.

[13] The formula employs the following variables: ExtW = weight of non-internal components; ExtSV = weighted-average value of non-internal components; IntW = weight of purchased internal components; IntSV = weighted-average value of purchased internal components; FreeW = weight of internal components provided free-of-charge by customers; FreeSV = weighted-average value of internal components provided free-of-charge by customers; WD% = percentage by which the Packed Weight for internal components exceeded the FOP weight for internal components.

written using the above fictitious values as (50% x 100 x ((100 x 0.1) + (100 x 0.2))/(100 + 100)

= 7.5.  See Final Calculation Analysis at 7–8.  As can be seen, this is not equivalent to the normal

value adjustment corresponding to the free-of-charge inputs, as the average surrogate value for

purchased internal components is lower than that of the free-of-charge components, bringing

down the combined average and improperly lowering the U.S. price adjustment.  See CS Wind

Request to Correct Clerical Errors, Ex. 7.  Unless Commerce is able to provide a mathematically

sustainable explanation as to why its adjustment appropriately offsets the inclusion of the free-of-

charge components in the normal value calculation, the court must hold that Commerce

miscalculated the adjustment to U.S. price.

## V.    Market Economy Input Purchases

CS Wind argues that Commerce's decision to reject CS Wind's market economy

purchase prices for flanges, welding wire, and wire flux, based on a suspicion or belief that they

were subsidized, is unsupported by substantial evidence and contrary to law.  Pl. Br. 31–40.  CS

Wind contends that Commerce has failed to provide objective and specific evidence of the

existence of subsidy programs within the Korean market from which its suppliers could have

received benefits.  Id. at 34–37.  CS Wind further supports its assertions by claiming that neither

CS Wind nor its manufacturers received or were even eligible to receive any export subsidies

based on these "domestic" purchases.  Id. at 37–40.  In its I&D Memo, Commerce found there

was "reason to believe or suspect" that CS Wind's purchase prices were distorted by "broadly

available, non-industry specific export subsidies" in South Korea, thereby justifying a departure

from its normal practice of using actual purchase prices for inputs from market economies.  I&D

Memo at 37–42.  As a result, Commerce determined that Indian import data, and not CS Wind's

actual purchase prices for flanges, welding wire, and wire flux sourced from South Korea, would

be used to value these FOPs.  Id. at 42.

       When valuing an FOP purchased from a market economy supplier and paid for in

a market economy currency, Commerce "normally" uses the price actually paid by the buyer.  19

C.F.R. § 351.408(c)(1).  Nevertheless, when there is "reason to believe or suspect" that these

inputs were subsidized, Commerce instead uses surrogate values from a market economy

country.  See Peer Bearing Co.-Changshan v. United States, 27 CIT 1763, 1769, 298 F. Supp. 2d

1328, 1334 (2003) (citing legislative history).  Although the legislative history clarifies that

Commerce need not conduct a full-fledged countervailing duty investigation before excluding

market economy purchase prices, it does not alter the general standard by which this court

evaluates all factual determinations by Commerce in trade remedy cases: substantial evidence.

See 19 U.S.C. § 1516a(b)(1)(B)(i).  Accordingly, "there must be some positive evidence on the

record to permit the court to evaluate whether Commerce's decision is supported by substantial

evidence."  Gold E. Paper (Jiangsu) Co. v. United States, 918 F. Supp. 2d 1317, 1324 (CIT

2013).  The burden of substantial evidence demands "more than a mere scintilla" of evidence; the

burden is met when there exists "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

       In Fuyao Glass, the court held that Commerce must justify its belief or suspicion

of price subsidization with specific and objective evidence.  Fuyao Glass Indus. Grp. v. United

States, 29 CIT 109, 114 (2005).  Under the standard applied in that case, Commerce was required

to show: "(1) subsidies of the industry in question existed in the supplier countries during the

[POI]; (2) the supplier in question is a member of the subsidized industry or otherwise could

have taken advantage of any available subsidies; and (3) it would have been unnatural for a

supplier not to have taken advantage of such subsidies." Id.  CS Wind alleges that under Fuyao

Glass Commerce has not met its burden in justifying its "reason to believe or suspect" that CS

Wind's purchase prices were tainted by subsidies.  Pl. Br. 34–37.  The government primarily

responds by claiming that Fuyao Glass is not binding precedent and has been ignored consistently

by Commerce.  Def. Resp. 30–33.

   The court agrees with CS Wind that the Fuyao Glass standard is one reasonable

method for evaluating the sufficiency of the evidence upon which Commerce based its belief or

suspicion that prices were subsidized.[14]  In this case, Commerce has met its burden under Fuyao

Glass, albeit reluctantly.  Commerce satisfied the first prong of the test by presenting evidence

that widely available, non-industry specific subsidies existed in Korea during 2010, just months

before the POI under review.  I&D Memo at 40 & n.247 (citing Issues and Decision

---

   [14] The court notes that the cases cited by Commerce in attempting to cast doubt on the
reasoning of Fuyao Glass fail to address the issue presently before the court.  For example, in
Jinan Yipin, the plaintiff waived any argument contesting Commerce's finding with respect to
generally available export subsidies.  See Jinan Yipin Corp. v. United States, 774 F. Supp. 2d
1238, 1244, 1248 (CIT 2011).  Likewise in Zhejiang Machinery, the plaintiff failed to argue
before the agency the standard set out in Fuyao Glass, as the court's decision post-dated the close
of the record.  Zhejiang Mach. Imp. & Exp. Corp. v. United States, 31 CIT 159, 166 n.10 (2007).
Similarly, the government's reliance on Commerce's finding in Fuyao Glass that the imports
there "are subsidized" versus may have been subsidized is a red herring, as Commerce later
abandoned its reliance on that distinction following remand, and the court retained the same
standard for evaluating Commerce's determination.  See Fuyao Glass, 29 CIT at 112–13.

   Commerce explained in its I&D Memo that it has continued to reject the
application of Fuyao Glass in other investigations and reviews.  See I&D Memo at 41–42.  Time
marches on.  In its investigations and reviews, Commerce must either abide by the standard set
out in Fuyao Glass or propose another reasonable means of evaluating whether it has sufficient
evidence to support a belief or suspicion that the market economy inputs in the particular case at
hand were subsidized.

Memorandum for the Final Determination in the Countervailing Duty Investigation of Bottom

Mount Combination Refrigerator-Freezers from the Republic of Korea, C-580-866, at 14–16

(Mar. 16, 2012) ("Refrigerator-Freezers"), available at

http://enforcement.trade.gov/frn/summary/korea-south/2012-7217-1.pdf (last visited Mar. 20,

2014) (discussing short-term export insurance program); Issues and Decision Memorandum for

the Countervailing Duty Administrative Review on Corrosion-Resistant Carbon Steel Flat

Products from the Republic of Korea, C-580-818, at 17, 19–20 (Jan. 7, 2009) ("CORE"),

available at http://enforcement.trade.gov/frn/summary/korea-south/E9-633-1.pdf (last visited

Mar. 20, 2014) (discussing countervailable short-term export financing system,

document/acceptance loans, and trade rediscount program in 2006)).  At least with respect to the

Refrigerator-Freezers determination, Commerce did not merely rely on the "existence, at some

point in time, of the subsidy programs" in Korea, Sichuan Changhong Electric Co. v. United

States, 30 CIT 1481, 1496, 460 F. Supp. 2d 1338, 1352 (2006), but rather it identified almost

contemporaneous findings of countervailable subsidies.  Thus, Commerce demonstrated with

specific and credible evidence that contemporaneous, widely available export subsidies existed in

Korea, thereby meeting the first prong of the Fuyao Glass test.

Turning to the second prong of Fuyao Glass, Commerce has met this standard

based on the same evidence discussed above for prong one because these prior countervailing

duty determinations demonstrate that South Korea had broadly available, non-industry specific

export subsidies for which exporters, including the suppliers of CS Wind, were eligible.  See

Sichuan, 30 CIT at 1495–96, 460 F. Supp. 2d at 1352–53 (finding that widely available, non-

specific export subsidies met the second prong of Fuyao Glass).  If Korea had suddenly

discontinued this export support program, this would have been publicly available information

CS Wind could have presented in rebuttal.

Under the third prong of Fuyao Glass, Commerce may meet its burden by

demonstrating "the competitive nature of [the] market economy countr[y]" in which the supplier

operates.  Fuyao Glass, 29 CIT at 118 (internal quotation marks omitted).  The burden is on

Commerce, however, to prove that "it would have been unnatural for a supplier to not have taken

advantage of such subsidies."  Id. at 114.  In the instant case, Commerce found that it would have

been against any market economy supplier's interest in Korea to not take advantage of these

subsidies.  See I&D Memo at 41–42.  Thus, Commerce has met the low threshold required under

this prong.

CS Wind argues that even if the Fuyao Glass test has been met by Commerce, this

simply creates a rebuttable presumption of subsidized prices that CS Wind has rebutted.  Pl. Br.

37–39.  CS Wind contends that the export subsidy programs found to exist in Refrigerators-

Freezers and CORE were available only to entities that export goods under export contracts from

Korea.  Pls.' Reply to Def. & Def.-Intvnrs. Resp. to Pls.' Rule 56.2 Mot. for J. upon the Agency

R., ECF No. 45, at 15–19.  In the instant case, CS Wind alleges that these input purchases were

domestic transactions and that the companies CS Wind purchased these inputs from did not

export goods and thus could not have received export subsidies under these programs.  Id.

Consequently, CS Wind alleges that CS Wind Corp., in South Korea, was the only entity in the

chain of these transactions that could have benefitted from export subsidies, and it is undisputed

that Commerce verified that CS Wind Corp. did not receive subsidies.  See id. at 17–19.

CS Wind's evidence, while entitled to some weight, is insufficient to show that

Commerce's determination was not supported by substantial evidence.  Although these inputs

were purchased in South Korea by CS Wind Corp., also located in South Korea, and then

exported to CS Wind Vietnam by CS Wind Corp., the transactional documents support

Commerce's determination that these documents could have been used by the suppliers to show

that an export transaction occurred, making them eligible for the subsidy programs.  The record

shows that two manufacturers of these inputs identified themselves as the "Exporter" of their

products on the certificates of origin.  See, e.g., Verification Exhibits at 14, 24, 28, 67, 76, CR

227–34 at bar code 3094071-06 (Aug. 30, 2012), ECF No. 42-11 (Dec. 11, 2013).  These

documents also support the findings that the manufacturers were aware that these products would

be exported to Vietnam and that the sales could be classified as export transactions through an

intermediary, CS Wind Corp.  Thus, Commerce was justified in its determination that "all parties

involved . . . had prior knowledge that these inputs were destined for exportation."  See I&D

Memo at 41.  As a result, it was not unreasonable for Commerce to determine that the suppliers

may have benefitted from the widely available export subsidies based on these "domestic"

transactions that Commerce permissibly found were export transactions.

         CS Wind also presented as rebuttal evidence correspondence from one of the

manufacturer's sales managers, stating that the company did not benefit from any export

subsidies.  See CS Wind Submission of Factual Data, Ex. 2 at bar code 3090709-01 (Aug. 6,

2012), ECF No. 27-17 (Aug. 8, 2013).  This individual, however, works in the sales division of a

large manufacturer, not in finance.  See id.; WTTC Aug. 15, 2012 Submission, Exs. 1, 2, CR 225

at bar code 3092349-01 (Aug. 15, 2012), ECF No. 42-9 (Dec. 11, 2013).  Thus, Commerce's

conclusion that this person might not know about the receipt of subsidies is reasonable,

especially when there is other record evidence showing past government awards for exports.  See

WTTC Submission of Additional Factual Information, Ex. 2, CR 216–21 at bar code 3091000-01

(Aug. 6, 2012), ECF No. 42-9 (Dec. 11, 2013).

As CS Wind's rebuttal arguments are insufficient to undermine Commerce's

finding, the court sustains Commerce's determination that there was reason to believe or suspect

that the inputs purchased in Korea were subsidized.

**VI.      Brokerage and Handling Costs**

CS Wind argues that Commerce acted unreasonably in creating a surrogate value

to be allocated per kilogram for export document preparation based on the weight of a full,

twenty-foot container instead of the weight of CS Wind's actual shipments.  Pl. Br. 49–52.  In its

Final Determination, Commerce relied upon the World Bank's 2012 Doing Business India report

to calculate a surrogate value for B&H costs, including those for document preparation and

customs clearance/technical control.  I&D Memo at 48–49.  The report was based on the costs

associated with exporting a filled, twenty-foot container; CS Wind, however, did not containerize

its wind tower segments, instead laying them in a pyramid fashion on the ship.  See id. at 48–50.

To account for the different form of shipment, Commerce converted the report's per shipment

document preparation cost of $415 into a per kilogram value based on the weight of a filled

twenty-foot container, 10,000 kg, instead of the weight of an average shipment of towers,

2,600,000 kg.  See id. at 49–50; Pl. Br. 49–51.  This resulted in a surrogate value of $0.0545/kg

for all B&H costs.  Pl. Br. 50.  Although CS Wind objected during the agency proceedings that

this overstated the document preparation charges, Commerce replied that it had no other way to

convert between the unit of measure in the Doing Business report and CS Wind's actual

shipments.  I&D Memo at 49–50.  Commerce further stated that it was following a consistent

practice employed in several prior agency proceedings.  Id. at 50 & n.283 (citing Crystalline

Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic

of China: Preliminary Determination of Sales at Less than Fair Value, Postponement of Final

Determination and Affirmative Preliminary Determination of Critical Circumstances, 77 Fed.

Reg. 31,309, 31,321 (Dep't Commerce May 25, 2012)).

        At the outset, it is useful to recognize what the document preparation costs are

intended to cover.  The Doing Business report explains that several documents typically are

required to export goods: bank documents, customs clearance documents, port terminal and

handling documents, and transport documents.  See Trading Across Borders Methodology,

World Bank, available at http://www.doingbusiness.org/methodology/trading-across-borders (last

visited Mar. 20, 2014) (cited in Surrogate Values for the Preliminary Determination, Ex. 6).

Underlying Commerce's calculation here must be an assumption that the $415 for document

preparation mentioned in the report was derived from a formula by which the exporter pays for

documents based on the weight of the goods, which simply is not reflective of reality.

Accordingly, implicit in Commerce's methodology is the incorrect assumption that a shipment

weighing less will incur lower document processing costs while a shipment weighing more will

incur higher processing costs.

        Common sense indicates that a half-full, twenty-foot container would incur the

same document preparation expenses as a full twenty-foot container of a single type of good.

The court has recognized previously that increasing the surrogate value for B&H proportionally

based on the weight of the shipment or the size of the container may not always be reasonable.

See Since Hardware (Guangzhou) Co. v. United States, 911 F. Supp. 2d 1362, 1380–81 (CIT

2013).  The government unsuccessfully attempts to distinguish that case from the present one,

arguing that unlike in Since Hardware, Commerce did not make a presumption of a proportional

increase in costs.  Def. Br. 40.

        The government's argument is nonsensical, and the same logic from Since

Hardware applies equally here.  By converting the document costs to a per kilogram value based

on the weight of a hypothetical twenty-foot container, and then multiplying that value by the

weight of CS Wind's actual shipments, Commerce has applied a proportional increase in the

B&H fees.  Commerce has failed to explain why document preparation costs, as opposed to other

B&H fees, would change depending on the size or weight of the shipment.  Taken to its logical

extreme, under Commerce's methodology, a single shipment of wind towers by CS Wind, at an

average weight of 2,600,000 kg, would incur a document preparation cost of over $100,000.  Pl.

Br. 51.  Such a position flies in the face of common sense and commercial reality.  Although the

court understands that Commerce typically converts all surrogate values into a per kilogram

amount for use in calculating dumping margins, its method of doing so here, based on the weight

of a filled twenty-foot container and not based on the weight of a shipment of wind towers, for

which the same documents would need to be prepared, is unreasonable and unsupported by

substantial evidence.  The reasonable conversion methodology here appears to be to calculate a

per kilogram surrogate value allocating the $415 document cost over the weight of the entire

wind tower shipment.  Accordingly, the court remands this issue to Commerce for recalculation

and/or further explanation.

**CONCLUSION**

As discussed above, Commerce has failed to support with substantial evidence its determinations with respect to the valuation of steel plate, carbon dioxide, overhead, and B&H fees. Although Commerce's decisions to disregard CS Wind's market economy input purchases and to adjust for the discrepancy between Packed Weight and FOP weight were reasonable, the adjustment to the U.S. sales price based on the weight discrepancy was not. Commerce shall file its remand determination by May 27, 2014. The parties shall have until June 24, 2014 to file objections, and the government shall have until July 11, 2014 to file its response.


                                                        /s/ Jane A. Restani
                                                       Jane A. Restani
                                                           Judge


Dated: March 27, 2014
          New York, New York