Slip Op. 14 - 128

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CS WIND VIETNAM CO., LTD. and CS WIND CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> WIND TOWER TRADE COALITION, <br><br> Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 13-00102 |

**OPINION**

[Commerce's Results of Redetermination in antidumping duty investigation sustained in part and remanded in part.]

Dated: November 3, 2014

  Bruce M. Mitchell, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, for the plaintiffs. With him on the brief were Andrew B. Schroth, Ned H. Marshak, Dharmendra N. Choudhary, and Kavit Mohan.

  Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Daniel J. Calhoun, Senior Attorney, Office of the Chief Counsel for Trade Compliance and Enforcement, U.S. Department of Commerce, of Washington, DC.

  Robert E. DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, for the defendant-intervenor. With him on the brief were Alan H. Price and Daniel B. Pickard.

Restani, Judge: This matter is before the court following a remand to the Department of Commerce ("Commerce") in <u>CS Wind Vietnam Co. v. United States</u>, 971 F. Supp. 2d 1271 (CIT 2014). The court remanded to Commerce for it to: 1) reconsider the appropriate surrogate value for Plaintiffs CS Wind Vietnam Co., Ltd. and CS Wind Corporation's (collectively "CS Wind") steel input; 2) reconsider the carbon dioxide surrogate value; 3) reconsider the calculation of overhead expenses for the surrogate financial ratios, specifically Commerce's treatment of jobwork charges and income line items; 4) re-determine the appropriate adjustment to CS Wind's U.S. sales price to account for the discrepancy in the reported weights of CS Wind's wind towers; and 5) reconsider the calculation of brokerage and handling ("B&H") costs. On remand, Commerce has failed to explain adequately its treatment of jobwork charges and income line items in calculating overhead expenses and, accordingly, this issue is remanded to Commerce for reconsideration or further explanation. In all other respects, Commerce's Results of Redetermination Pursuant to Court Order, ECF No. 57 ("<u>Remand Results</u>"), are supported by substantial evidence and are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous opinion, although they are summarized below. <u>See</u> <u>CS Wind Vietnam Co.</u>, 971 F. Supp. 2d at 1275–95.

After a petition was filed by defendant-intervenor Wind Tower Trade Coalition ("WTTC"), Commerce conducted an antidumping ("AD") investigation into certain wind towers from Vietnam. <u>Id.</u> at 1275. Much of the investigation focused on selecting surrogate values for

Case 1:13-cv-00102-JAR   Document 77   Filed 11/03/14   Page 3 of 17

valuing CS Wind's factors of production ("FOPs"). Id. at 1275–76. These surrogate values were used to compute the normal value, representing the cost of CS Wind's production if it had operated in a market economy. Id. at 1276. Commerce published its final affirmative AD duty determination and accompanying Issues & Decision Memorandum in December 2012. <u>Utility Scale Wind Towers from the Socialist Republic of Vietnam: Final Determination of Sales at Less than Fair Value</u>, 77 Fed. Reg. 75,984 (Dep't Commerce Dec. 26, 2012) ("<u>Final Determination</u>"); Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Socialist Republic of Vietnam, A-552-814, (Dec. 17, 2012), <u>available at</u> http://enforcement.trade.gov/frn/summary/vietnam/2012-30944-1.pdf (last visited Oct. 20, 2014) ("<u>I&D Memo</u>"). CS Wind was assigned a weighted-average dumping margin of 51.50 percent. <u>Final Determination</u>, 77 Fed. Reg. at 75,988.

In its motion for judgment on the agency record, CS Wind presented six arguments challenging Commerce's <u>Final Determination</u>: 1) Commerce lacked substantial evidence and acted contrary to law when it used Global Trade Atlas ("GTA") import data rather than Steel Guru Indian domestic prices ("Steel India") data to value steel plate; 2) Commerce impermissibly valued carbon dioxide based on GTA import data; 3) Commerce improperly calculated surrogate financial ratios by failing to offset certain expenses with related income line items; 4) Commerce acted contrary to law and without substantial evidence in rejecting the market economy input prices paid for flanges, welding wire, and wire flux; 5) Commerce impermissibly adjusted normal value based on a weight discrepancy and then incorrectly adjusted the U.S. sales price; and 6) Commerce used an inflated document preparation fee in

calculating B&H expenses.  CS Wind Vietnam Co., 971 F. Supp. 2d at 1276.  In ruling on CS Wind's motion for judgment on the agency record, the court remanded to Commerce and ordered Commerce to reconsider 1) the data selected to calculate the steel plate surrogate value, 2) the data selected to calculate the carbon dioxide surrogate value, 3) the surrogate financial ratio calculations treating jobwork expenses and income differently, 4) the adjustment to U.S. sales price based on the weight discrepancy, and 5) the calculation of B&H expenses.  Id. at 1284, 1285, 1286–87, 1291, 1295–96.  The court rejected the remainder of CS Wind's challenges.

On remand, Commerce reconsidered the record evidence and amended several of its surrogate value and U.S. price determinations.  Remand Results at 2–21.  First, Commerce concluded that the GTA data were not the best available data with respect to either steel plate or carbon dioxide values.  Remand Results at 5, 13–14.  Regarding steel plate, Commerce determined that because only a small portion of the prices included in the GTA data were for S355 grade steel (the type of steel used by CS Wind), it was not in fact the best information available.  Remand Results at 5–6.  Instead, Commerce determined that the Steel India data were better because those data were comprised solely of IS2062 grade, a comparable grade to S355.  Id.  For carbon dioxide, Commerce determined that the SICGIL Indian Ltd. ("SICGIL") financial statement provides greater specificity for surrogate value calculation because it provides pricing information for carbon dioxide gas, the particular input used by CS Wind.  Remand Results at 14.  In reconsidering overhead expenses in calculating surrogate financial ratios, Commerce attempted to include in overhead only the portion of jobwork charges not associated with erection and civil income activities.  See Remand Results at 16–18.  In recalculating its weight adjustment to CS Wind's U.S. sales price, Commerce limited the

adjustment to free-of-charge components to correct the mathematical error identified by the court in <u>CS Wind Vietnam Co.</u>, 971 F. Supp. 2d at 1289–91.  <u>Remand Results</u> at 19.  Finally, Commerce recalculated B&H costs on a per-kilogram basis using the actual weight of CS Wind's shipments.  <u>Remand Results</u> at 21.

     CS Wind agrees with Commerce's <u>Remand Results</u> except as to Commerce's revised surrogate financial ratios based on the jobwork charges calculations.  Pls.' Cmts. in Resp. to the Dep't of Commerce's Final Results of Redetermination 2–14, ECF No. 62 ("Pls.' Cmts."). WTTC contests each of Commerce's determinations on remand.  Def.-Intvnr.'s Cmts. on Results of Redetermination Pursuant to Remand 6–32, ECF No. 65 ("Def.-Intvnr.'s Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

     The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2013).  The court will uphold Commerce's redetermination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.**     **Redetermination of Steel Plate Surrogate Value**

     In antidumping cases involving a non-market economy ("NME"), Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  "[T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  <u>Id.</u>  Furthermore, Commerce "shall utilize, to the extent possible, the

prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." Id. § 1677b(c)(4).

"Nowhere does the statute speak directly to any methodology Commerce must employ to value the factors of production, indeed the very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work." Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 (1999); see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (recognizing that Commerce is entitled to deference in interpreting the undefined term "best available information"). Specifically, "[w]here Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable." Catfish Farmers of Am. v. United States, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009).

Nonetheless, selection of the best available information must be in line with the overall purpose of the antidumping statute, which the Court of Appeals for the Federal Circuit has explained to be "determining current margins as accurately as possible." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). In calculating normal value in the NME context, the particular aim of the statute is to determine the non-distorted cost of producing such goods. See Lasko Metal Prods., Inc. v. United States, 16 CIT 1079, 1081, 810 F. Supp. 314, 316–17 (1992).

In past investigations and reviews, Commerce has indicated that it prefers surrogate values which are period-wide, representative of a broad market average, specific to the input in

question, net of taxes and import duties, contemporaneous with the period of investigation ("POI"), and publicly available.  See I&D Memo at 9.  Commerce also has "a strong preference for valuing all FOPs in the primary surrogate country."  Id.

In its Final Determination, Commerce determined that the best available data from which to value CS Wind's steel plate input were GTA Indian import statistics utilizing India Harmonized Tariff Schedule ("HTS") line 7208.51.10, the tariff category for "flat-rolled products of iron or non-alloy steel, of a width of 600 mm or more, hot-rolled, not clad, plated or coated, other, not in coils, not further worked than hot rolled: of a thickness exceeding 10 mm: plates."  I&D Memo at 7; Remand Results at 2.  Commerce used the GTA data because the data were contemporaneous, from the primary surrogate country (India), from an HTS category that includes the relevant grade of steel plates (S355), net of taxes and duties, and publicly available.  I&D Memo at 9.  The GTA data, however, represent a basket average of numerous grades of steel, of which only 4 percent are of the same grade utilized by CS Wind: S355.  Def.'s Resp. to Cmts. on Redetermination Pursuant to Court Remand 12, ECF No. 73 (Def.'s Resp.); CS Wind Vietnam Co., 971 F. Supp. 2d at 1284.  Because the court determined that Commerce had impermissibly disregarded other sources of data for valuation and corroboration purposes, it remanded to Commerce to consider those sources.  CS Wind Vietnam Co., 971 F. Supp. 2d at 1284.

On remand, Commerce valued CS Wind's steel plate input using a surrogate value derived from the Steel India data.  Remand Results at 2.  Commerce found that the Steel India data were representative of a broad market average form the primary surrogate country, exclusive of all duties and taxes, publicly available, and contemporaneous with the POI.

Remand Results at 4.  Commerce also determined that the Steel India data were more product specific than the GTA data because although the Steel India data did not include data for the exact grade of steel used by CS Wind, it only included prices for a grade of steel that is comparable to S355, namely IS2060.  Remand Results at 5–6.  In contrast, up to 96 percent of the steel prices included in the GTA data were not comparable to S355.  CS Wind Vietnam Co., 971 F. Supp. 2d at 18; Remand Results at 6.  Commerce additionally noted the Steel India data's product specificity because, unlike the GTA data, the Steel India data contain prices for the specific thicknesses of steel plate used by CS Wind and are based on domestic data, which Commerce prefers over import statistics.  Remand Results at 6 (citing Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp. 2d 1322, 1333 (CIT 2010)).  Finally, the prices derived from Steel India are corroborated by several other data sources.  Remand Results at 6–11; Def.'s Resp. 10.

In contesting the Remand Results, WTTC argues that IS2062 is not comparable to S355 such that the Steel India data are not more product specific than the GTA data.  Def.-Intvnr.'s Cmts. 8–27.  WTTC specifically argues that because S355 is structural steel plate with additional alloying elements that command a price premium, it cannot be comparable to IS2062, which is a commodity grade steel.  Id. at 12.  Record evidence, however, supports Commerce's conclusion that IS2062 does have similar characteristics and end uses as S355.  The evidence includes the fact that IS2062 is listed as structural steel plate in at least one source cited by WTTC.  WTTC Pre-Preliminary Comments on Steel Plate, Ex. 1, P.R. 252–54 (July 10, 2012).  Additionally, IS2062, along with grade ASTM A36, is contained in a list of grades appropriate for wind towers, and IS2062 is included on a list of grade fit for high tensile applications.  CS Wind's

Post-Preliminary Surrogate Value Submission, Exs. 3E & 3M, P.R. 302–304 (Sept. 17, 2012). Record evidence also suggests that ASTM A36 is equivalent to IS2062. Id. at Ex. 3E (identifying A36 and IS2062 as wind tower steel); Def.-Intvnr.'s Cmts. 16 ("Indian grade IS2062 and European grades S235 and 275 are equivalent to U.S. ASTM grade A36 . . . ."). The comparability of the two steel grades is further supported by the original petition, which stated that "[t]he primary inputs utilized in the production of a wind tower is carbon quality steel plate (often ASTM Grade A36) utilized to form the tower structure." Petition for the Imposition of Antidumping and Countervailing Duties, Vol. IV 21, P.R. 2–4 (Dec. 29, 2011). Further, WTTC has failed to address several of the GTA data's shortcomings identified by Commerce that made the Steel India data preferable, whether or not it has some defects. See Remand Results at 5–6, 11, 24–25.

"Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable." Catfish Farmers of Am. v. United States, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009). Here, Commerce acted reasonably in selecting the Steel India data because it covers only steel that is of a comparable grade to S355 in that it is appropriate for use in wind towers, is specific as to the thickness used by CS Wind, is based on domestic prices, and is generally corroborated by other data sets on the record. Commerce's decision was reasonable in the light of the fact that although the GTA data preferred by WTTC contained a small amount of the specific grade used by CS Wind, it also included a host of other grades that might not be suitable for wind towers, was not specific as to thickness, and was based

on import prices. Accordingly, Commerce's use of the Steel India data as the steel plate surrogate value is sustained.

## II. Redetermination of Carbon Dioxide Surrogate Value

In the Final Determination, Commerce relied on GTA Indian import data to value CS Wind's carbon dioxide gas input, using the tariff heading for "carbon dioxide: other." I&D Memo at 45–46. Commerce chose this data over more specific data found in the SICGIL financial statement, which was limited to carbon dioxide gas. Id. Initially, Commerce had found the SICGIL data to be "reflective of the primary surrogate country, specific to the input in question, and net of taxes and import duties." Id. at 45. Commerce, however, was "not able to determine . . . whether or not the SICGIL price data is representative of a broad market average." Id.. Commerce further found fault with the SICGIL data because it was not contemporaneous with the POI. Id.

The court remanded this issue to Commerce because Commerce failed to address CS Wind's argument that the SICGIL financial statement showed that the quantity of carbon dioxide gas produced by SICGIL was more than twice the annual quantity of all carbon dioxide imports in the relevant tariff category, according to the GTA data. CS Wind Vietnam Co., 971 F. Supp. 2d at 1285. On remand, Commerce determined that the SICGIL financial statement provides a better source of pricing information for carbon dioxide gas than the GTA data upon which Commerce based its Final Determination. Remand Results at 13–14.

WTTC challenges Commerce's use of the SICGIL data based on the known and acknowledged infirmities of the data, namely that it is not clear whether they represent a broad market average and that they are not contemporaneous with the POI. Def.-Intvnr.'s Cmts. 27. In

reconsidering the SICGIL data, Commerce relied on the specificity of the carbon dioxide input in the SICGIL data, carbon dioxide gas, which is the exact input used by CS Wind. Remand Results at 14. Commerce also noted that SICGIL is a large producer of carbon dioxide gas. Id. at 14, 28. In contrast, the GTA data are not limited to imports of the specific type of carbon dioxide (i.e., gas) that CS Wind uses. See id. Although the data relied upon by Commerce might not have completely satisfied all of Commerce's preferences in evaluating surrogate value sources, the court cannot find on this record that Commerce acted unreasonably in giving greater weight to the specificity of the product over the lack of contemporaneity and the concerns regarding whether the SICGIL data are based on broad market averages. See Sichuan Changhong Elec. Co. v. United States, 30 CIT 1481, 1504, 460 F. Supp. 2d 1338, 1359 (2006) (upholding Commerce's use of data found by Commerce to be more accurate even though data was not as contemporaneous as data determined to be less accurate). Because this selection is supported by substantial evidence, the Remand Results are sustained on this issue.

**III.   Surrogate Financial Ratios**

In its Final Determination, Commerce calculated surrogate financial ratios using Ganges Internationale's ("Ganges") financial statements. CS Wind Vietnam Co., 971 F. Supp. 2d at 1285. In calculating surrogate financial ratios, Commerce's practice has been to offset expense line items associated with the general operations of the company with related income line items. Id. at 1286–87 (citations omitted). In its Final Determination, Commerce treated the line item for "Jobwork Charges (including Erection and Civil Expenses)" in the financial statement as part of overhead expenses, but did not include the erection income and civil income line items as corresponding offsets to overhead. Id. Commerce rejected CS Wind's ministerial error

allegation regarding this decision, but the court held that treating the charges and associated income line items differently was unsupported by substantial evidence and remanded the issue to Commerce with instructions to either include or exclude both from the overhead calculation. Id.

On remand, Commerce continued not to offset the total erection and civil income line items against total Jobwork Charges, but revised the surrogate financial ratios in an attempt to exclude from overhead expense the portion of jobwork charges associated with erection and civil income. Remand Results at 16. According to Commerce, because Commerce typically includes only miscellaneous income items as an offset in calculating the surrogate financial ratios and the portion of jobwork charges relating to erection and civil income arose from separate revenue generating activities, it was proper not to offset erection and civil income directly against all jobwork charges. Remand Results at 16–17. Rather, because erection and civil income do not relate to general manufacturing, excluding the portion of jobwork expenses relating to those line items from overhead was the preferable course of action. Id. This is a reasonable approach in theory and could satisfy the court's remand direction. See CS Wind Vietnam Co., 971 F. Supp. 2d at 1287. In actually calculating the portion of jobwork expenses related to erection and civil income, however, Commerce may have erred.

In seeking to identify the portion of jobwork charges not relating to erection and civil income activities, Commerce identified all the income items reflected in the financial statements that reasonably could be associated with jobwork. Remand Results at 17–18. Commerce then determined the percentage of the total income reasonably associated with jobwork comprised of erection and civil income. Id. Commerce then applied the resulting 8.28 percent to the total

jobwork charges to determine the value of jobwork charges to be excluded from overhead. Id. at 17.

Both WTTC and CS Wind challenge Commerce's jobwork methodology. WTTC claims that none of the line items Commerce excluded in calculating the portion of jobwork associated with erection and civil income should have been so treated, and that at a minimum, the court should require Commerce to provide a more detailed explanation for its decision. Def.-Intvnr.'s Cmts. 29. CS Wind argues that the line items identified as being associated with jobwork income have no nexus with jobwork and accordingly Commerce's methodology is overbroad. Pls.' Cmts. 5–7. Specifically, CS Wind argues that "Sale of Finished Goods" and "Sale of Scrap" should not have been included in calculating the total income associated with jobwork because by including those line items, Commerce conflated the value of the finished good with the value of the jobwork, and incorrectly assumed that all finished goods must have been produced through jobwork. Id. at 8. CS Wind further alleges that "Miscellaneous Income" was improperly included as jobwork income because to include it in the calculation is contrary to Commerce's normal practice of categorizing miscellaneous income as part of general operations and offsetting it against selling, general, and administrative expenses. Id. at 9. Finally, CS Wind argues that only a portion of "Services income from TSP activities" should have been included in calculating total income associated with jobwork. Id. at 10. According to CS Wind, had Commerce looked only at the face of the financial statements and used common sense, it would have calculated total income associated with jobwork by summing "Sales of Jobwork," "Erection Income," and "Civil Income." Id. at 11. Using this method, CS Wind calculated that erection and civil income account for 98.65 percent of jobwork income. Id. at 12.

As indicated, in theory Commerce's methodology complies with the remand order, but in practice, Commerce is still treating expense and income line items differently without stating an acceptable reason. The financial statement schedule explaining jobwork charges as "including Erection and Civil Expenses" provided substantial evidence for Commerce's conclusion that only a portion of jobwork charges relate to erection and civil income. CS Wind Request to Correct Clerical Errors, Ex. 1 at 5, C.R. 245 (Dec. 26, 2012). For similar reasons, WTTC's argument that it was not reasonable for Commerce to conclude that a portion of jobwork expenses relates to erection and civil income is without merit. See id.

In determining which income line items could be associated with jobwork, Commerce asserts that it eliminated income line items "where jobwork costs reasonably could not have been incurred in the generation of [erection and civil] income." Remand Results at 32. Even though Commerce "does not look beyond the face of the financial statement" to determine what each item includes or to what activities it relates, Commerce still has failed to provide a reasoned analysis for its decision. See CS Wind Vietnam Co., 971 F. Supp. 2d at 1287. Given that there is a specific income line item for "Sales of Jobwork," that seemingly would encompass the income from jobwork, Commerce's explanation for how and why it included other line items in calculating the total income associated with jobwork is insufficient and not supported by substantial evidence. Commerce has failed to provide an adequate reasoned explanation for the line items it included as relating to jobwork expenses because the line item for "Sale of Jobwork" ostensibly would encompass the income from jobwork not captured in the "Erection Income" and "Civil Income" line items. Commerce's entirely cursory rejection of CS Wind's arguments regarding why the other line items should be excluded from the jobwork calculation is

insufficient to support its determination. See Remand Results at 34. Accordingly, Commerce's calculation of the surrogate financial ratios is remanded for recalculation or further explanation.

IV. **U.S. Sales Price Adjustment**

In its Final Determination, Commerce made parallel adjustments based on facts available to CS Wind's normal value and export price to account for an unexplained discrepancy between the total weight of CS Wind's reported FOPs and total "Packed Weight" of the finished product. CS Wind Vietnam Co., 971 F. Supp. 2d at 1276; I&D Memo at 29–33. Commerce was able to determine that a discrepancy regarding the weight of the internal components included in the wind towers was the reason for the difference, but was unable to identify which internal components (self-produced, purchased, or free-of-charge) were underreported. Remand Results at 18. The court originally sustained the adjustment to normal value, but held that the adjustment to U.S. sales price to account for the inclusion of free-of-charge components in the calculation of normal value was not "mathematically sustainable." CS Wind Vietnam Co., 971 F. Supp. 2d at 1287–91. The court found that because Commerce multiplied the weight shortfall for the free-of-charge components by the combined weighted-average surrogate value for all internal components instead of by the weighted-average surrogate value for only the free-of-charge components, Commerce had miscalculated the adjustment. CS Wind Vietnam Co., 971 F. Supp. 2d at 1290–91.

On remand, Commerce revised its calculation to reflect the weighted-average surrogate value of only the free-of-charge components in accordance with the court's ruling. Remand Results at 19; Def.'s Resp. 23–24. WTTC continues to argue that Commerce's initial adjustment was proper. Def.-Intvnr.'s Cmts. 30–31. As explained in the court's previous opinion, such an

adjustment does not fit the purpose of Commerce's adjustment to U.S. price, namely to cancel out the inclusion of the free-of-charge components in normal value.  See CS Wind Vietnam Co., 971 F. Supp. 2d at 1290–91.  The Remand Results regarding the U.S. sales price adjustment thus comply with the court's order, appear to be mathematically correct, and are supported by substantial evidence.

V.    **B&H Costs**

Originally, in accordance with its normal methodology, Commerce used the World Bank's Doing Business India 2012 report to allocate B&H costs on a per-kilogram basis based on the costs of importing a hypothetical full 20-foot, 10,000 kg container.  CS Wind Vietnam Co., 971 F. Supp. 2d at 1294–95.  The court determined that such a methodology was illogical as applied to CS Wind's document preparation costs given the unique shipping method used to transport wind towers.  Id.  Rather than being shipped in containers, the towers are stacked in a pyramid on the ship making any reliance on containerization for cost analysis inapplicable.  Accordingly, the court indicated that a reasonable way to convert B&H costs would be to calculate a per-kilogram surrogate value allocating the $415 document cost indicated in the Doing Business Report over the weight of the entire wind tower shipment.  Id.

On remand, Commerce allocated the $415 document cost based on the average weight of CS Wind's shipments.  Remand Results at 20–21.  Such a method does not inappropriately create a proportional increase in B&H fees based on the weight of the shipment, which was the court's concern in its prior ruling.  See CS Wind Vietnam Co., 971 F. Supp. 2d at 1295.  WTTC argues that Commerce inappropriately abandoned the 20-foot container methodology, but ignores the fact that the court specifically indicated that commercial reality made Commerce's

Court No. 13-00102                                                                                                    Page 17

normal methodology inapplicable in this case.  See Def.-Intvnr.'s Cmts. 31–32.  Accordingly, Commerce fully complied with the court's order and its calculation is supported by substantial evidence.  The Remand Results are therefore sustained with respect to B&H costs.

## CONCLUSION

In conclusion, Commerce's Remand Results are sustained as to Commerce's surrogate values for the steel plate and carbon dioxide inputs, Commerce's calculation of the U.S. sales price adjustment, and Commerce's calculation of B&H costs.  The Remand Results are remanded as to the surrogate financial ratios calculation and Commerce is instructed to reconsider and provide further explanation for its calculation of the portion of jobwork charges associated with erection and civil income.

Commerce shall file its remand determination with the court before or on January 5, 2015.  The parties shall have until February 5, 2015 to file objections, and the government will have until February 20, 2015, to file its response.

                                                                        /s/ Jane A. Restani
                                                                          Jane A. Restani
                                                                               Judge

Dated: November 3, 2014
       New York, New York