Slip Op. 15- 45

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CS WIND VIETNAM CO., LTD. and CS WIND CORPORATION,<br><br>             Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br><br>             Defendant,<br><br>WIND TOWER TRADE COALITION,<br><br>             Defendant-Intervenor. | Before: Jane A. Restani, Judge<br><br>Court No. 13-00102 |

**OPINION**

[Commerce's Results of Redetermination in antidumping duty investigation sustained.]

                                                                                                        Dated: May 11, 2015

      Bruce M. Mitchell, Andrew B. Schroth, Ned H. Marshak, Dharmendra N. Choudhary, and Kavita Mohan, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, and Washington, DC, for the plaintiffs.

      Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were Benjamin C. Mizer, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Lisa W. Wang, Attorney, Office of the Chief Counsel for Trade Compliance and Enforcement, U.S. Department of Commerce, of Washington, DC.

      Robert E. DeFrancesco, III, Alan H. Price, and Daniel B. Pickard, Wiley Rein, LLP, of Washington, DC, for the defendant-intervenor.

      Restani, Judge: Currently before the court is the U.S. Department of Commerce's ("Commerce") Final Redetermination Pursuant to Court Order, ECF No. 82 ("Second Remand Results"). The court remanded to Commerce for reconsideration or further explanation of its

calculation of the surrogate financial ratios used in determining the antidumping ("AD") duty margin for plaintiffs CS Wind Vietnam Co., Ltd. and CS Wind Corporation (collectively "CS Wind"). CS Wind Vietnam Co. v. United States, Slip Op. 14-128, 2014 Ct. Int'l Trade LEXIS 129 (CIT Nov. 3, 2014) ("CS Wind II"). Commerce's revised calculations are supported by substantial evidence, and the Second Remand Results are sustained.

## BACKGROUND

Following a petition by defendant-intervenor Wind Tower Trade Coalition ("WTTC"), Commerce conducted an AD investigation into certain wind towers from Vietnam. CS Wind Vietnam Co. v. United States, 971 F. Supp. 2d 1271, 1275 (CIT 2014) ("CS Wind I"). Because Vietnam is a non-market economy, in determining the proper AD duty margin, Commerce was required to calculate a normal value for the wind towers based on surrogate data from a country that is a significant producer of comparable products and similar economic development (the "surrogate country"). 19 U.S.C § 1677b(c)(4) (2012). In this context, calculating normal value essentially estimates the cost of producing the product were the producer to hypothetically operate in a market economy and involves calculating the factors of production for the subject merchandise, such as labor, raw materials, energy, and the cost of capital. Id. § 1677b(c)(3); see also Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006); Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 303 n.7, 366 F. Supp. 2d 1264, 1277 n.7 (2005). The governing statute, 19 U.S.C. § 1677b(c)(1)(B), also requires that normal value include amounts for "general expenses and profit" in addition to the cost of the surrogate values for the factors of production. Guangdong Chems., 30 CIT at 1422, 460 F. Supp. 2d at 1373; Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7.

In calculating the "general expenses and profit" to be included in normal value, Commerce generally uses Selling, General, and Administrative ("SG&A") and overhead expense ratios as well as profit ratios (collectively "surrogate financial ratios"). See Guangdong Chems., 30 CIT at 1422, 460 F. Supp. 2d at 1373; Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7. The surrogate financial ratios are derived from the financial statements of one or more surrogate companies that produce comparable merchandise in the surrogate country. See Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7. The SG&A ratio is calculated by dividing the surrogate company's SG&A costs by the total cost of manufacturing, the overhead ratio is calculated by dividing total manufacturing overhead expenses by total direct manufacturing expenses, and the profit ratio is calculated by dividing the before-tax profit of the surrogate company by the sum of direct expenses, manufacturing overhead, and SG&A expenses. Id. The surrogate financial ratios are then applied to the factors of production values and the result is added to the factor of production value to determine normal value. See Guangdong Chems., 30 CIT at 1422, 460 F. Supp. 2d at 1373; Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7.

Based on its calculations of CS Wind's normal value, Commerce subsequently assigned CS Wind a weighted-average dumping margin of 51.50%. Utility Scale Wind Towers from the Socialist Republic of Vietnam: Final Determination of Sales at Less than Fair Value, 77 Fed. Reg. 75,984, 75,988 (Dep't Commerce Dec. 26, 2012) ("Final Determination"); Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Socialist Republic of Vietnam, A-552-814 (Dec. 17, 2012), available at http://enforcement.trade.gov/frn/summary/vietnam/2012-30944-1.pdf (last visited Apr. 28, 2015) ("I&D Memo"). CS Wind challenged Commerce's Final Determination on six

grounds; relevant to the remand determination currently before the court is CS Wind's argument that Commerce improperly calculated the surrogate financial ratios, specifically overhead expenses, using Ganges Internationale Private Limited's ("Ganges") April 1, 2010–March 31, 2011 financial statement.[1]  In calculating the surrogate financial ratios, Commerce is limited in its ability to look beyond the face of the financial statements because it cannot compel information from the surrogate companies, as those companies are not parties to the investigation.  See Thai Plastic Bags Indus. Co. v. United States, 949 F. Supp. 2d 1298, 1305–08 (CIT 2013).

In the Final Determination, Commerce treated the line item "Jobwork Charges (including Erection and Civil Expenses)" as part of overhead expenses in calculating the surrogate financial ratios.  I&D Memo at 26.  Commerce argued this was proper because jobwork charges are third-party expenses and it is Commerce's practice to include such miscellaneous expenses in overhead when direct labor and energy expenses are listed separately in the financial statement.[2]  Id.  Jobwork expenses normally refer to the costs paid to third parties to whom raw materials are sent to manufacture finished goods and thus do not include the cost of raw materials (which are captured elsewhere) or direct labor (which is not utilized because the third party's labor is used).  See Pls.' Cmts. in Resp. to the Dep't of Commerce's Final Results of Second Remand

---

[1] Prior to the Final Determination, CS Wind advocated for the use of Ganges as the surrogate company for surrogate financial ratio purposes.  Commerce accepted CS Wind's argument and the parties have not challenged the use of Ganges' financial statement, although it is apparent from the complex and technical nature of the dispute about the surrogate financial ratios that Ganges' financial statement is not a perfect fit.  See CS Wind I, 971 F. Supp. 2d at 1285–87.

[2] By including jobwork charges in overhead expenses, Commerce rejected CS Wind's argument that they be included as labor expenses, because, according to Commerce, treating them as labor would have resulted in double counting.  I&D Memo at 26.

Redetermination 13, ECF No. 84 ("Pls.' Cmts."). The dispute in this case centered on the inclusion of erection and civil expenses within jobwork charges, because it is unclear whether those expenses are also third-party expenses which would be properly included in overhead, and what offsets are applicable. When Commerce includes overhead expenses, it typically offsets those expenses with related income line items. Here, although Commerce offset "Jobwork Charges (including Erection and Civil Expenses)" with "Sales of Jobwork," it did not offset them with "Erection Income" and "Civil Income."[3] See CS Wind I, 971 F. Supp. 2d at 1285; Results of Redetermination Pursuant to Court Order 15, ECF No. 57 ("First Remand Results").

Offsetting "Erection Income" and "Civil Income" against jobwork charges would have reduced overall overhead expenses, reduced the overhead ratio, and ultimately resulted in a lower normal value, and thus, a lower AD duty margin. Without the offsets, the resulting surrogate financial ratios for overhead and SG&A expenses were 21.71% and 10.42%, respectively, and the AD duty margin was set at 51.50%. Final Determination, 77 Fed. Reg. at 75,988; First Remand Results at 17–18. The profit ratio was 0.58% and has remained unchanged throughout the remand proceedings. First Remand Results at 18; Second Remand Results at 7; Final Surrogate Value Memorandum, Ex. 6 Financial Ratios Calculation, bar code 3111181-01 (Dec. 17, 2012). The court held that Commerce's apparent disparate treatment of jobwork, erection, and civil expenses and jobwork, erection, and civil income warranted a remand. CS Wind I, 971 F. Supp. 2d at 1287. The court reasoned that the similarity of the language between

---

[3] CS Wind filed a ministerial error allegation claiming that this was a calculation error. Commerce denied the ministerial error allegation, claiming that it intentionally did not offset jobwork charges with "Erection Income" and "Civil Income" because erection and civil income did not meet the definition of "miscellaneous income items," which are the only line items Commerce typically offsets against overhead expenses. See CS Wind I, 971 F. Supp. 2d at 1285–86.

the expense and income line items rendered Commerce's decision to offset "Jobwork Charges (including Erection and Civil Expenses)" with only "Sales of Jobwork," but not with "Erection Income" or "Civil Income," unsupported by substantial evidence. Id.

In its first remand redetermination, Commerce decided not to rely on its original methodology. Rather, Commerce reconsidered and revised its calculations. Commerce continued not to offset "Erection Income" and "Civil Income" against overhead expenses. First Remand Results at 16. Instead, Commerce attempted to include in overhead expenses only the portion of "Jobwork Charges (including Erection and Civil Expenses)" not associated with erection and civil income activities. See id. at 16–18. Under Commerce's rationale, if the portion of jobwork charges associated with erection and civil expenses were excluded from overhead expenses, there would be no reason to offset overhead expenses with "Erection Income" and "Civil Income." Commerce thus would have complied with the court's directive to treat income and related expense line items similarly or explain why they should not be treated similarly. See CS Wind I, 971 F. Supp. 2d at 1287. Unfortunately, Ganges' financial statement did not specify the amount of "Jobwork Charges (including Erection and Civil Expenses)" associated with only erection and civil expenses. Accordingly, Commerce derived that portion of the expense by calculating a ratio of erection and civil income to the total income associated with jobwork (hereinafter "erection/civil income ratio"). First Remand Results at 17. Commerce assumed that the ratio, based on the income side of the financial statement, would be the same on the expense side of the financial statement. The parties have not specifically challenged that assumption. Commerce then multiplied "Jobwork Charges (including Erection and Civil Expenses)" by the erection/civil income ratio to determine the portion of "Jobwork Charges (including Erection and Civil Expenses)" to be excluded from overhead expenses. Id.

In calculating the total income associated with jobwork (as a substitute for expenses), Commerce aggregated "Sales of Jobwork," "Erection Income," "Civil Income," "Sale of Finished Goods," "Scrap," "Miscellaneous Income," and "Services income from TSP activities." See CS Wind II, 2014 Ct. Int'l Trade LEXIS 129, at *17–18.  Based on these changes, the overhead and SG&A expense ratios changed from 21.71% and 10.42% to 20.22% and 10.50%, respectively.[4]  First Remand Results at 18.  Based on all of the changes made in the First Remand Results, the AD duty margin was reduced to 17.07%.  First Remand Results at 37.  The court determined that although Commerce's revised methodology might be "a reasonable approach in theory," Commerce failed to provide adequate explanation in support of its calculation, specifically, how and why it included certain line items in calculating the total income associated with jobwork.  CS Wind II, 2014 Ct. Int'l Trade LEXIS 129, at *16–20.  The court remanded the issue for reconsideration or further explanation once again.  Id. at *20.

In its second remand determination, Commerce continues to utilize the same methodology for calculating overhead expenses, but rather than merely explaining that methodology, further refines its calculation.  Commerce continues to include "Sales of Jobwork," "Erection Income," "Civil Income," "Sales of Finished Goods," and "Scrap" in the denominator of the erection/civil income ratio, as it asserts those line items are associated with jobwork.[5]  Second Remand Results at 5–6.  Commerce also revises the erection/civil income

---

[4] The parties do not challenge the methodology for making changes to the SG&A ratio corresponding to the changes to the overhead ratio.

[5] Commerce now excludes "Services Income from TSP Activities" and "Miscellaneous Income" from the calculation because Ganges' financial statement does not provide evidence as to whether these income line items relate to jobwork.  Second Remand Results at 5.  (continued…)

ratio to exclude the portion of revenues from "Sales of Finished Goods," "Scrap," "Erection Income," and "Civil Income" related to raw materials and direct labor. Id. at 7–8, 12–13.  In doing so, Commerce calculates a ratio of the sum of raw materials and direct labor expenses to the sum of raw materials, direct labor, energy, and overhead expenses (hereinafter "raw materials/direct labor ratio"),[6] and applies the resulting ratio to "Sales of Finished Goods," "Scrap," "Erection Income," and "Civil Income" in the denominator, and to "Erection Income" and "Civil Income" in the numerator of the erection/civil income ratio.[7]  Id.; Pls.' Cmts. at 8.

---

(continued…)
Neither CS Wind nor WTTC objects to these exclusions.  The unadjusted erection/civil income ratio is thus:

$$a = \frac{EI + CI}{SOJW + EI + CI + SOFG + Scrap}$$

Where EI=Erection Income, CI=Civil Income, SOJW=Sales of Jobwork, and SOFG=Sales of Finished Goods.

[6] The raw materials/direct labor ratio is thus:

$$b = \frac{RM + DL}{RM + DL + E + O}$$

Where RM=raw materials, DL=direct labor, E=energy, and O=overhead.  The resulting ratio is 82.03%.  Second Remand Results at 13.

[7] Although Commerce does not state that it also applied the raw materials/direct labor ratio to the numerator of the erection and civil income ratio in its Second Remand Results, it is apparent from the calculation.  The result is the following:

$$a(adjusted) = \frac{b * EI + bC * I}{SOJW + b * EI + b * CI + b * SOFG + b * Scrap}$$

Where b is the raw materials/direct labor ratio calculated above.  The resulting ratio is 8.62%.  Second Remand Results at 13.  This ratio is applied to the jobwork charges line item and the result is then used to reduce the jobwork charges line item, substituting for a partial direct offset to this overhead item.

Due to the revisions adopted in the Second Remand Results, the overhead and SG&A expense ratios changed from 20.22% and 10.50% to 20.16% and 10.51%, respectively, and the AD duty margin was further reduced from 17.07% to 17.02%.  Second Remand Results at 7–8.

Both CS Wind and WTTC contest Commerce's Second Remand Results and argue that Commerce should exclude "Sales of Finished Goods" and "Scrap" from the calculation of the erection/civil income ratio.  See Pls.' Cmts. at 9–11; Def.-Intvnr.'s Cmts. on Final Redetermination Pursuant to Court Order 3–5, ECF No. 85 ("Def.-Intvnr.'s Cmts.").  They also both argue that Commerce should not employ the raw materials/direct labor ratio, albeit for different reasons.  See Pls.' Cmts. at 11–15; Def.-Intvnr.'s Cmts. at 3–5.

CS Wind argues that Commerce's analysis is circular and confusing because Commerce has misinterpreted the scope of erection and civil income.  Pls.' Cmts. at 9–12.  CS Wind reasserts its argument that Commerce's entire methodology is unnecessary and could be avoided by simply including the entire value of "Jobwork Charges (including Erection and Civil Expenses)" in overhead and offsetting that value with "Sales of Jobwork," "Erection Income," and "Civil Income."  Id. at 16–17.  Alternatively, if the court accepts Commerce's methodology, CS Wind claims that "Sales of Jobwork" encompasses all jobwork income and thus Commerce's methodology unreasonably broadens the concept of jobwork income.  Id. at 10–11.  As for the inclusion of "Sales of Finished Goods" and "Scrap" as income associated with jobwork, CS Wind argues that Commerce has failed to appreciate the nuance that Ganges incurs jobwork expense, rather than receives jobwork income, when it produces finished goods via third parties on a jobwork basis.  Id. at 9–10, 13.  Thus CS Wind argues that Commerce should exclude those two line items from the denominator of the erection/civil income ratio.  Id. at 16.

Relative to the raw materials/direct labor ratio, CS Wind challenges Commerce's decision to adjust "Sales of Finished Goods," "Scrap," "Erection Income," and "Civil Income" for raw materials and direct labor but not for energy, overhead expenses, SG&A expenses, and profit. Id. at 12. CS Wind further claims that because erection and civil expenses are associated with jobwork charges, the corresponding income line items also relate only to jobwork income and are thus exclusive of raw materials and direct labor. Id. at 13. Therefore, there would be no need to apply the raw materials/direct labor ratio to those line items. Because CS Wind also argues that "Sales of Finished Goods" and "Scrap" should be excluded from the erection/civil income ratio, according to CS wind, the entire raw materials/direct labor ratio is unnecessary. See id. at 12–13.

WTTC argues that Commerce should revert to its decision in the Final Determination. Def.-Intvr.'s Cmts. at 5. WTTC contends that because jobwork charges are third-party expenses, the only offsets Commerce should allow against jobwork charges are those relating to third-party services generating income. Id. at 1. WTTC does not agree with CS Wind that because the language "Sales of Jobwork," "Erection Income," and "Civil Income" is similar to that of "Jobwork Charges (including Erection and Civil Expenses)," that those line items automatically should be offset. Id. at 1, 4. Rather, WTTC argues those line items incorporate more than third-party services generating income and thus should not be offset. Id. It argues alternatively that if the court determines that those three line items are sufficiently related to jobwork, "Sales of Finished Goods" and "Scrap" should not be included in calculating the total revenue associated with jobwork because they also do not involve third-party services income, but rather involve the generation of third-party expenses. Id. at 3–5. WTTC also argues against using a one-to-one offset of "Erection Income" and "Civil Income" because those income line items include raw

materials and labor, but jobwork charges include only third-party labor services.  Id. at 4–5.  WTTC does not present specific arguments for how Commerce should exclude income derived from raw materials and direct labor.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold Commerce's redetermination in an AD investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.  **Inclusion of "Sales of Finished Goods" and "Scrap"[8]**

CS Wind argues that the inclusion of "Sales of Finished Goods" and "Scrap" as income line items associated with jobwork is erroneous because Ganges incurred jobwork expenses as opposed to receiving jobwork income when it produced a portion of its finished goods through jobwork by a third party.  Pls.' Cmts. at 9–11.  Therefore, according to CS Wind, Commerce's inclusion of "Sales of Finished Goods" and "Scrap" as income associated with jobwork is incorrect and unwarranted.  Id.  WTTC similarly argues that Commerce should exclude "Sales of Finished Goods" and "Scrap" from the calculation because Ganges' financial statement provides no evidence that they are associated with third-party services income such as jobwork.  Def.-Intvnr.'s Cmts. at 3–5.

To support the inclusion of "Sales of Finished Goods," Commerce reasons that because Ganges' financial statement states that the finished goods manufactured by Ganges include "production done by 3rd parties on a jobwork basis," it is reasonable to include "Sales of

---

[8] Putting aside the parties' more general objections, neither party specifically challenges Commerce's inclusion of "Sales of Jobwork," "Erection Income," and "Civil Income" as income associated with jobwork in the denominator of the erection/civil income ratio.

Finished Goods" in the total revenue associated with jobwork. Second Remand Results at 5–6; see also CS Wind Post-Preliminary Surrogate Value Submission Ex. 2A Ganges Internationale Financial Statement Schedule 21, item 14(a), bar code 3096954-01 (Sept. 14, 2012) ("Ganges' Financial Statement"). As for "Scrap," Commerce argues that because Ganges does not list scrap as a raw material input, but instead includes scrap as inventoried items ("stocks"), scrap sold must have been generated during the manufacturing of finished goods. Second Remand Results at 6; see also Ganges' Financial Statement Schedule 21, item 14(a), (b). Thus, according to Commerce, because the company's manufacturing process includes jobwork done by third parties, revenue derived from scrap generated during that process is similarly associated with jobwork. Second Remand Results at 6.

Commerce is attempting to derive reasonable surrogate financial ratios from the financial statement CS Wind selected. Commerce is afforded wide discretion in calculating normal value and in applying the guidelines of 19 U.S.C. § 1677b(c), particularly with respect to calculating overhead expenses. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999); Peer Bearing Co. v. United States, 25 CIT 1199, 1216, 182 F. Supp. 2d 1285, 1306 (2001) (holding that "[a]lthough the Court could certainly question the perfection of Commerce's approach, . . . Commerce attempted to capture . . . the surrogate company's experience in incurring overhead and SG&A expenses, and created a reasonably internally consistent ratio that, as imperfect as it might be, does not violate the boundaries set by 19 U.S.C. § 1677b(c)"); Timken Co. v. United States, 25 CIT 939, 954–55, 166 F. Supp. 2d 608, 625 (2001) (holding that as long as Commerce's surrogate overhead and SG&A ratios are "reasonabl[y] internally consistent," they can be supported by substantial evidence). Because of the imperfect fit and

ambiguities in the financial statement, Commerce has reasonably acted to derive a surrogate financial ratio that is supported by the record.

CS Wind is correct in saying that Ganges incurs jobwork expenses when it produces a portion of finished goods (as well as scrap) through jobwork done by third parties, the amount of which is likely captured by "Jobwork Charges (including Erection and Civil Expenses)." CS Wind, however, overlooks the fact that Ganges also receives income from the sale of finished goods and scrap and that a portion of that income is derived from jobwork. According to CS Wind, this income is included under "Sales of Jobwork," which encompasses all income accruing from jobwork. Pls.' Cmts. at 10–11. CS Wind's argument, however, is untenable because CS Wind also acknowledges that Ganges' jobwork income arises when it expends its own labor to process raw materials received from outside parties. Id. at 10. Ganges' financial statement does not specify what is captured in "Sales of Jobwork" and, as indicated, Commerce is not equipped to look beyond the face of the financial statement.

Logically, there is substantial evidence to support Commerce's determination. It is a reasonable inference that the label—"Sales of Jobwork"—refers to revenue from jobwork performed by Ganges for outside parties, but not, as CS Wind argues, any income associated with jobwork, including revenues from the sale of finished goods and scrap produced through jobwork by third parties. The revenue accruing from the sale of finished goods and scrap is thus associated with jobwork, but is not captured in "Sales of Jobwork." Therefore, Commerce's inclusion of "Sales of Finished Goods" and "Scrap" in the total income associated with jobwork is supported by substantial evidence.

Commerce's methodology and calculations are arguably imperfect. Had Commerce drawn other inferences about the ambiguous term in the financial statement, a much simpler

solution might have been simply to offset "Jobwork Charges (including Erection and Civil Expenses)" with "Sales of Jobwork," "Erection Income," and "Civil Income." Commerce's inclusion of "Sales of Finished Goods" and "Scrap" in the calculation of the erection/civil income ratio ultimately, however, was proper, and Commerce's inferences are supported by substantial evidence, as indicated. See Nation Ford, 166 F.3d at 1377; Peer Bearing, 25 CIT at 1216, 182 F. Supp. 2d at 1306.

## II.     Raw Materials/Direct Labor Ratio

CS Wind also opposes Commerce's calculation and application of the raw materials/direct labor ratio to four line items ("Sales of Finished Goods," "Scrap," "Erection Income," and "Civil Income") in the calculation of the erection/civil income ratio. Pls.' Cmts. at 11–15. CS Wind challenges the calculation of the ratio employed by Commerce with respect to "Sales of Finished Goods" and "Scrap" because the ratio addresses only direct labor and raw materials, but not other relevant factors, such as overhead and SG&A expenses, and profit, without any explanation. Id. at 11–12. Relative to the ratio's application to "Erection Income" and "Civil Income," CS Wind argues these line items in the financial statement should be interpreted to include only the cost of labor charges paid to third parties such that any revised raw materials/direct labor ratio need not be applied to those two line items. Id. at 13–15. CS Wind argues that because "Sales of Jobwork" should be interpreted to include only third-party labor costs, given the association of jobwork charges with erection and civil expenses, "Erection Income" and "Civil Income" should be interpreted in the same manner as "Sales of Jobwork." Id. Accordingly, because CS Wind contends that "Sales of Finished Goods" and "Scrap" should be excluded from the erection/civil income ratio and the raw materials/direct labor ratio does not apply to "Erection Income" and "Civil Income," CS Wind essentially argues that the raw

materials/direct labor ratio is completely unnecessary. See Pls.' Cmt. at 9–16. WTTC, for its part, argues that Commerce should revert to its Final Determination and not offset any line items,[9] but alternatively argues against a one-to-one offset of "Erection Income" and "Civil Income" against jobwork charges. Def.-Intvnr.'s Cmts. at 4–5; see also CS Wind I, 971 F. Supp. 2d at 1285–87.

The problem with Ganges' financial statement for these purposes is that it does not identify the value of each income line item attributable to jobwork. Commerce thus needed to devise a methodology to distill the income related solely to jobwork. Accordingly, in its Second Remand Results, Commerce calculates a ratio of raw materials and direct labor expenses to the sum of raw materials, direct labor, energy, and overhead expenses. Second Remand Results at 7–8, 12–13. Commerce argues that it seeks to exclude only raw materials and direct labor because the other expenses suggested by CS Wind (energy, overhead, SG&A, and profit) are associated with total jobwork expenses. Def.'s Resp. to Cmts. on Second Redetermination Pursuant to Ct. Remand 10–11, ECF No. 90 (Def.'s Resp.). Presumably, jobwork expenses do not include direct labor because in incurring jobwork expenses, raw materials are provided to third parties who perform the labor and thus no direct labor is utilized. Raw materials are reasonably excluded from jobwork expenses because the raw materials are provided to the third party who performs the labor and the raw material costs are separately accounted for elsewhere as a factor of production such that including them in jobwork expenses would result in double counting. Merely because jobwork is exclusive of raw materials and direct labor costs does not

---

[9] Commerce decided after the court remanded the issue in CS Wind I not to explain its Final Determination more fully, but instead adopted a new methodology, which WTTC must now address. See First Remand Results at 14–18; see generally Second Remand Results. WTTC has failed to adequately challenge Commerce's revised methodology.

mean, however, that other expenses are not incurred. For example, administrative services might be used in organizing and managing the jobwork, and presumably some energy is necessary to maintain a suitable work environment. CS Wind's argument that other expenses should be included in the raw materials/direct labor ratio, essentially eliminating the ratio by making it equivalent to one, are unpersuasive as those other costs are reasonably associated with total jobwork expenses. Accordingly, Commerce's decision to adjust for only raw materials and direct labor is supported by substantial evidence, and Commerce's calculation of the raw materials/direct labor ratio is supported by substantial evidence. See Nation Ford, 166 F.3d at 1377; Peer Bearing, 25 CIT at 1216, 182 F. Supp. 2d at 1306.

  Relative to the application of the raw materials/direct labor ratio, in its Second Remand Results, Commerce applies the ratio to all variables in the erection/civil income ratio, other than "Sales of Jobwork." Second Remand Results at 13. Commerce reasonably interprets this line item as expressly including only jobwork income. Id. Although CS Wind alleges that Commerce does not explain why Commerce applied the ratio to "Erection Income" and "Civil Income," Commerce specified that it was treating "Erection Income" and "Civil Income" differently from "Sales of Jobwork" because they were listed separately from "Sales of Jobwork" on the income side of the financial statements. Pls.' Cmts. at 11–12; Def.'s Resp. at 11. Thus, according to Commerce, they could not be presumed to be exclusive of direct labor and raw materials. Def.'s Resp. at 11. This inference is supported by substantial evidence, as there is no indication that "Erection Income" and "Civil Income" are not produced through direct labor or do not utilize raw materials, and Commerce's rationale that the distinct treatment on the income side of the financial statement warranted disparate treatment is reasonable. Accordingly, although arguably imperfect, Commerce's calculation and application of the raw materials/direct

labor ratio is supported by substantial evidence.  See Nation Ford, 166 F.3d at 1377; Peer Bearing, 25 CIT at 1216, 182 F. Supp. 2d at 1306.

## CONCLUSION

Given the necessity of using non-party surrogate financial statements that are not subject to in-depth investigation, Commerce has arrived at an overhead ratio that is a reasonable attempt to fulfill the statutory directive to calculate a complete normal value based on surrogate data.  Commerce used the ambiguous financial statement proposed by CS Wind and drew adequately supported and internally consistent inferences about the ambiguities.  That it might have drawn other inferences and thus used other methodologies does not undermine the result.  Therefore, Commerce's Second Remand Results are sustained and judgment will issue accordingly.

    /s/ Jane A. Restani
    Jane A. Restani
    Judge

Dated: May 11, 2015
    New York, New York