Slip Op. 17-26

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CS WIND VIETNAM CO., LTD., and CS WIND CORPORATION,** | |
| Plaintiffs, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 13-00102** |
| Defendant, | |
| **WIND TOWER TRADE COALITION,** | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Commerce's Results of Redetermination in antidumping duty investigation are sustained.]

Dated:  March 16, 2017

<u>Bruce M. Mitchell</u>, <u>Andrew B. Schroth</u>, <u>Ned H. Marshak</u>, and <u>Dharmendra N. Choudhary</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, for plaintiffs.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Emily R. Beline</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Alan H. Price</u>, <u>Daniel B. Pickard</u>, <u>Robert E. DeFrancesco, III</u>, and <u>Derick G. Holt</u>, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor.

Restani, Judge:  This matter is before the court following a remand to the U.S.

Department of Commerce ("Commerce") ordered after the Court of Appeals for the Federal

Circuit ("Federal Circuit") issued its mandate in <u>CS Wind Vietnam Co. v. United States</u>, 832

F.3d 1367 (Fed. Cir. 2016) ("<u>CS Wind IV</u>").  In <u>CS Wind IV</u>, the Federal Circuit reversed this

court's "affirmance of Commerce's use of packing weights rather than component weights in its

calculation of surrogate values," and "direct[ed] Commerce to use the manufacturer-reported

weights in its calculation."  <u>Id.</u> at 1374, 1381.  In addition, the Federal Circuit vacated this

court's "affirmance of Commerce's overhead determination with respect to jobwork charges,

erection expenses, and civil expenses."  <u>Id.</u> at 1381.  This court remanded to Commerce the

issues of weights selection and overhead determination.  Order 1, Oct. 4, 2016, ECF No. 101

("Remand Order").  Subsequently, Commerce issued its Final Results of [Third]

Redetermination Pursuant to Court Order, ECF No. 104-1.  ("<u>Third Remand Results</u>").

Defendant-Intervenor Wind Tower Trade Coalition ("WTTC") opposes the <u>Third Remand</u>

<u>Results</u> on several grounds.  Def.-Intvr. the Wind Tower Trade Coalition's Cmts. on Final

Results of Redetermination Pursuant to Ct. Order 7–29, ECF No. 108 ("WTTC Cmts.").  For the

following reasons, Commerce's <u>Third Remand Results</u> are sustained.

## BACKGROUND

The court presumes familiarity with the underlying facts and procedural history of this

case, and provides only the following relevant facts.

## I.      Weights Selection

In <u>CS Wind Vietnam Co. v. United States</u>, 971 F. Supp. 2d 1271, 1287–88 (CIT 2014)

("<u>CS Wind I</u>"), this court sustained Commerce's decision to base the actual weight of CS Wind

Vietnam Co., Ltd. ("CS Wind")'s wind towers for the normal value calculation on the weights

found in a transoceanic packing list ("packed weights"), rather than on the net weight of the

factors of production reported by CS Wind ("manufacturer-reported weights").  The court agreed

with Commerce's rationale that the packed weights would not likely have been "so grossly

overestimated as to chance the misplacement of the wind tower section on a shipping vessel and

risk an imbalance of the vessel or rolling of the tower section in transit." Id. at 1288 (quoting

Issues and Decision Mem. for the Final Determination at 31, barcode 3111148-01 (Dec. 17,

2012)).  On appeal, the Federal Circuit decided that substantial evidence did not support

Commerce's conclusion that the packed weights were more reliable than the manufacturer-

reported weights. CS Wind IV, 832 F.3d at 1374.  The Federal Circuit reasoned that "there is no

evidence that either (a) a mere 4% difference in overall weight [between the packed weights and

manufacturer-reported weights] or (b) the specific difference in weight figures for the small

internal-components portion of the towers [in the manufacturer-reported weights] would make a

difference in maintaining balance on the vessels used for transportation here." Id.  Accordingly,

the Federal Circuit reversed this court's affirmance of Commerce's use of the packed

weights. Id. at 1381.  In addition, the Federal Circuit "direct[ed] Commerce to use the

manufacturer-reported weights in its calculation." Id. at 1374.  This court then instructed

Commerce to follow the Federal Circuit's direction to use the manufacturer-reported weights in

its calculation. Remand Order at 1.  In the Third Remand Results, Commerce selected under

protest the manufacturer-reported weights. Third Remand Results at 7.  Commerce's sole reason

for this choice was the Federal Circuit's "direct[ion]" and this court's accordant remand

instructions. Id.

## II.       Surrogate Financial Ratios

### A.       Erection/Civil Income Ratio

Commerce uses surrogate financial ratios, which it converts to percentages, to calculate

the "general expenses and profit" to be included in normal value. See 19 U.S.C.

§ 1677b(c)(1)(B) (requiring that the normal value for products from nonmarket economies include amounts for "general expenses and profit"); Hebei Metals & Minerals Imp. & Exp. Corp., 29 CIT 288, 303 n.7, 366 F. Supp. 2d 1264, 1277 n.7 (2005).  The surrogate financial ratios include the selling, general, and administrative ("SG & A") ratio, the overhead expense ratio, and the profit ratio.  Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7. Commerce applies these ratios to the factors of production in order to calculate normal value.  See 19 U.S.C. § 1677b(c)(1)(B); Hebei Metals, 29 CIT at 303 n.7, 366 F. Supp. 2d at 1277 n.7.  To calculate the surrogate financial ratios, Commerce relies on surrogate financial statements, here, from Ganges Internationale Private Limited ("Ganges").  See CS Wind Viet. Co. v. United States, Slip Op 15-45, 2015 WL 2167462, at *2 (CIT May 11, 2015) ("CS Wind III").  One particular expense line item in Ganges' financial statements has proven particularly difficult to deal with—"Jobwork Charges (including Erection and Civil Expenses)."[1]  For reasons discussed below, Commerce has employed an "erection/civil income ratio," albeit in evolved forms, to determine what amount of the jobwork charges line item to include as overhead expenses.  See CS Wind III, 2015 WL 2167462, at *1–7; CS Wind Viet. Co. v. United States, Slip Op. 14–128, 2014 WL 5510084, at *2, 6–7 (CIT Nov. 3, 2014) ("CS Wind II"); Third Remand Results at 7–16.

The erection/civil income ratio sustained by this court in CS Wind III and remanded by the Federal Circuit in CS Wind IV worked as follows.  See CS Wind III, 2015 WL 2167462, at *1–5.  Commerce derived the ultimate (adjusted) erection/civil income ratio by combining an

---

[1] "Erection expenses" are expenses "for setting up the tower on the foundation," and "civil expenses" are "payments for preparing the foundation on which to set a tower."  CS Wind IV, 832 F.3d at 1370.  Together, these activities are referred to as "tower setup."  Id.

unadjusted erection/civil income ratio with a "raw materials/direct labor exclusion ratio." Id. at

*4 & n.5.  The unadjusted erection/civil income ratio, defined as "a," was:

$$a = \frac{EI + CI}{SOJW + EI + CI + SOFG + Scrap}$$

Where EI = Erection Income, CI = Civil Income, SOJW = Sales of Jobwork, SOFG = Sales of

Finished Goods, and Scrap = Sales of Scrap.  Id. at *4 n.5.  The raw materials/direct labor

exclusion ratio, defined as "b" and derived from values in the expense side of the financial

statements, was:

$$b = 1 - \frac{RM + DL}{RM + DL + E + O}$$

Where RM = Raw Materials, DL = Direct Labor, E = Energy, and O = Overhead.  CS Wind III,

2015 WL 2167462 at *4 n.6; see also CS Wind IV, 832 F.3d at 1379 n.5 (explaining

Commerce's methodology of excluding raw material and direct labor expenses from the

erection/civil income ratio).  The adjusted erection/civil income ratio was:

$$a\ (adjusted) = \frac{b * EI + b * CI}{SOJW + b * EI + b * CI + b * SOFG + b * Scrap}$$

CS Wind III, 2015 WL 2167462 at *4 n.7.  Commerce's erection/civil income ratio yielded a

percentage, 8.62%, which it then multiplied by the jobwork charges line item, subtracting the

resulting amount from the total value of the jobwork charges line item.  Id.  Commerce then

included the remaining portion of the jobwork charges line item in overhead expenses for use in

the surrogate financial ratios.  Id.

        In its Third Remand Results, Commerce has once again revised the erection/civil income

ratio, this time by:  (1) eliminating Sales of Jobwork from the denominator of the erection/civil

income ratio, Third Remand Results at 8, 11; (2) removing Direct Labor from the numerator of

the raw materials/direct labor exclusion ratio, thus changing the raw materials/direct labor

exclusion ratio to a "raw materials exclusion ratio," id. at 8; (3) choosing to apply the raw

materials exclusion ratio only to Sales of Finished Goods and Scrap, id.; and (4) multiplying the

erection/civil income ratio by "Store and Spares" expenses and "In-House Labor" expenses[2] in

addition to the jobwork charges line item, and then subtracting the resulting amounts from

overhead expenses, id. at 7–8, 11.  Thus, the new unadjusted erection/civil income ratio is:

$$a = \frac{EI + CI}{EI + CI + SOFG + Scrap}$$

The new raw materials exclusion ratio is:

$$b = 1 - \frac{RM}{RM + DL + E + O}$$

And the new adjusted erection/civil income ratio is:

$$a \text{ (adjusted)} = \frac{EI + CI}{EI + CI + b * SOFG + b * Scrap}$$

The revised erection/civil income ratio resulted in a percentage of 26.42%, which, as discussed,

Commerce applied to the jobwork charges line item, In-House Labor expenses, and Store and

Spares expenses.  Third Remand Results at 8, Analysis Mem. at Attach. 1.  Due to the revisions

adopted in the Third Remand Results, the overhead and SG & A ratios lowered from 20.16% and

10.50% to 16.49% and 10.42%, respectively.  See Third Remand Results at 11; Final

Redetermination Pursuant to Ct. Order 8, ECF No. 82 ("Second Remand Results"); Results of

Redetermination Pursuant to Ct. Order 18, ECF No. 57 ("First Remand Results").  In addition,

because of the Third Remand Results's revisions, the antidumping duty margin on CS Wind's

---

[2] Commerce does not explicitly identify the line items it considers to constitute In-House Labor expenses.  Commerce apparently uses the term, however, to refer to the following expense items: (1) "Salaries, Wages and Bonus"; (2) "Contribution to Provident and Other Fund"; and (3) "Workmen and Staff Welfare Expenses."  See Analysis Mem. for Draft Results of Redetermination at Attach. 1, PD 2 (Nov. 23, 2016) ("Analysis Mem.") (listing items to which Commerce applied the erection/civil income ratio).

towers was reduced from 17.02% to 0.0%.  See Third Remand Results at 20; Second Remand Results at 8.

     B.     Solicitation of Information from Ganges

     Presumably in an effort to avoid the need for Commerce's complex methodology, the Federal Circuit in CS Wind IV directed Commerce to say on remand whether Commerce has the authority to seek clarifying information from a third party surrogate value company like Ganges. 832 F.3d at 1380.  The Federal Circuit also requested Commerce, if it possesses authority to seek such clarification, to "explain why it is reasonable to refrain from [doing so], generally or in this particular matter."  Id.  In its Third Remand Results, Commerce notes that it has the authority to seek clarifying information from a third party surrogate value company like Ganges.  Third Remand Results at 12–13.  But, Commerce states, it "maintains a practice of refraining from 'peeking behind' the underlying data of surrogate financial statements placed on the record by interested parties[.]"  Id. at 12.  Commerce explains this position by saying that it cannot compel responses from third parties, that it cannot ensure the timeliness or accuracy of responses, and that dealing with the responses would be a burden and generally is not likely to result in valuable data.  Id. at 14–15.  Thus, Commerce has not issued a questionnaire to Ganges seeking clarification regarding its financial statements.  Id. at 15–16.

**III.**    **Steel Plate Surrogate Value**

     In response to the solicitation by Commerce of comments on Commerce's Draft Results of Redetermination Pursuant to Court Order, PD 1 (Nov. 23, 2016) ("Draft Third Remand Results"), WTTC encouraged Commerce to revise the surrogate value for steel plate consumed by CS Wind because "information developed in the first administrative review conclusively demonstrates that its surrogate value selection is simply wrong and based on material

misstatements by CS Wind."  WTTC Cmts. at 24.[3]  CS Wind submitted new Steel Guru India

("Steel India") data during the first administrative review in January of 2015.  See Def.'s Resp.

to Cmts. on the Final Results of [Third] Redetermination 17, ECF No. 118 ("Gov't Resp.");

Decision Mem. for the Final Results of the 2013–2014 Administrative Review of the

Antidumping Duty Order on Utility Scale Wind Towers from the Socialist Republic of Vietnam

at 9 & n. 25, A-552-814, (Sept. 8, 2015), available at

http://enforcement.trade.gov/frn/summary/vietnam/2015-23155-1.pdf (last visited Mar. 2, 2017)

("First AR I&D Memo").  CS Wind's submission of new Steel India data occurred after the court

sustained Commerce's selection of the original Steel India data over Global Trade Atlas

("GTA") import data in CS Wind II in November of 2014, but before WTTC submitted

comments in February of 2015 on Commerce's Second Remand Results.  See Def.-Intvr. Wind

Tower Trade Coalition's Cmts. on Final Redetermination Pursuant to Ct. Order 1, ECF No. 85

("WTTC Second Remand Results Cmts.").  No party opposed Commerce's continued use of the

original Steel India data in the Second Remand Results, sustained by this court in CS Wind III,

or appealed the matter to the Federal Circuit in CS Wind IV.  In the latest remand proceeding

Commerce refused to consider WTTC's comment regarding steel plate surrogate value because

of its "unsolicited argument and factual information."  Rejection Letter at 1.

---

[3] The court relies on WTTC's characterization of its comment because, due to Commerce's
rejection of the comment, the comment's text was omitted from the record.  See WTTC Cmts. on
Third Draft Results of Redetermination at Attach. 1, PD 9 (Dec. 7 2016) ("WTTC Draft Remand
Cmts.") (lacking text of WTTC's comment on steel plate surrogate value); Commerce Letter
Rejecting WTTC's Original Cmts. on Draft Remand at 1, PD 7 (Dec. 5, 2016) ("Rejection
Letter").  In its rejection of the comment, however, Commerce similarly characterizes WTTC's
comment as "provid[ing] information that [WTTC] stated pertains to the type of steel used to
produce wind towers."  Rejection Letter at 1.

WTTC makes several arguments in opposition to the <u>Third Remand Results</u>.  First, WTTC contends that Commerce failed to adequately explain its decision to use the manufacturer-reported weights instead of the packed weights in its calculations.  WTTC Cmts. at 9–18.  Second, WTTC argues that Commerce should have requested clarifying information from Ganges regarding the jobwork charges line item.  <u>Id.</u> at 18–23.  Lastly, WTTC submits that Commerce should have the opportunity to revise its surrogate value for CS Wind's steel plate input because the data used in the <u>Third Remand Results</u> is "wrong and based on material misstatements by CS Wind."  <u>Id.</u> at 24–29.  Commerce and CS Wind respond that the court should sustain the <u>Third Remand Results</u>.  Gov't Resp. at 6–21; Pls.' Cmts. on Remand Results 2–27, ECF No. 105 ("CS Wind Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds Commerce's redetermination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## ANALYSIS

### I.    Weights Selection

WTTC argues that Commerce took the Federal Circuit's "direct[ion]" to use the manufacturer-reported weights in the normal value calculation "too literally."  WTTC Cmts. at 10.  WTTC contends that the Federal Circuit cannot lawfully dictate a decision to Commerce, and that Commerce should have been mindful of this purported principle when issuing its <u>Third Remand Results</u>.  <u>Id.</u> at 10–11.  WTTC reasons that, because Commerce relied solely on the Federal Circuit's direction and this court's accordant Remand Order in making its

selection, <u>Third Remand Results</u> at 7, Commerce failed to adequately explain its weights

selection.  WTTC Cmts. at 11–13.  WTTC also repeats the merits of its case, detailing why the

packed weights are accurate.  <u>Id.</u> at 13–18.

    The government responds that Commerce correctly interpreted the Federal Circuit's

opinion.  Gov't Resp. at 8.  It argues that WTTC's concern over the Federal Circuit's instruction

is a dispute with the Federal Circuit, not Commerce, and notes that WTTC could have sought

further review of the Federal Circuit's decision.  Gov't Resp. at 7–8.  The government also states

that Commerce "reanalyzed the record evidence" on remand, and points to record evidence

supporting Commerce's decision.  <u>Id.</u> at 7–9.  CS Wind, meanwhile, argues that the Federal

Circuit's reversal of Commerce binds this court, citing for support both stare decisis and the law-

of-the-case doctrine, specifically, the mandate rule.  CS Wind Cmts. at 3–4.

    Because the Federal Circuit's direction to Commerce bound Commerce under the

mandate rule to use the manufacturer-reported weights, Commerce's reliance on that instruction

is an adequate explanation for Commerce's choice.  "Under the mandate rule, a court below [or

an agency[4]] must adhere to a matter decided in a prior appeal unless one of three 'exceptional

circumstances' exist[.]"[5]  <u>Banks v. United States</u>, 741 F.3d 1268, 1276 (Fed. Cir. 2014).  "[I]n

---

[4] <u>See</u> <u>Corus Staal BV v. U.S. Dep't of Commerce</u>, 27 CIT 1180, 1184 & n.9, 279 F. Supp. 2d
1363, 1368 & n.9 (2003).

[5] The mandate rule applies here, which is part of the law-of-the-case doctrine, <u>ArcelorMittal
France v. AK Steel Corp.</u>, 786 F.3d 885, 888 (Fed. Cir. 2015), rather than stare decisis.  Whereas
stare decisis makes legal rules "binding in future cases," the mandate rule applies only in
"ongoing case[s]."  <u>See</u> <u>Mendenhall v. Cedarapids, Inc.</u>, 5 F.3d 1557, 1570 (Fed. Cir. 1993)
(describing stare decisis); <u>Dow Chem. Co. v. Nova Chems. Corp. (Canada)</u>, 803 F.3d 620, 627
(Fed. Cir. 2015) (explaining the mandate rule).  Because the Federal Circuit's ruling was part of
the present "ongoing case," the mandate rule, not stare decisis, applies.  The distinction matters
because the mandate rule contains exceptions, but stare decisis does not.  <u>See</u> <u>Hutto v. Davis</u>, 454

(continued . . .)

interpreting [the Federal Circuit's] mandate, 'both the letter and the spirit of the mandate must be

considered.'" TecSec, Inc. v. Int'l Bus. Machs. Corp., 731 F.3d 1336, 1342 (Fed. Cir. 2013)

(quoting Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1383 (Fed. Cir. 1999)).  In CS

Wind IV, the Federal Circuit unambiguously decided the matter of which weights Commerce

should use as the "best available information" under 19 U.S.C. § 1677b(c)(1).  See 832 F.3d at

1374.  The Federal Circuit not only "reverse[d] the Court of International Trade's affirmance" of

Commerce's selection of the packed weights, but also "direct[ed] Commerce to use the

manufacturer-reported weights in its calculation."  Id.  Under the mandate rule, the Federal

Circuit's decision on the matter of weights selection in the prior appeal of CS Wind IV binds

Commerce and this court unless an exception applies.[6]

     The mandate rule applies unless:  "(1) subsequent evidence presented at trial was

substantially different from the original evidence; (2) controlling authority has since made a

contrary and applicable decision of the law; or (3) the decision was clearly erroneous 'and would

work a manifest injustice.'"  Banks, 741 F.3d at 1276 (quoting Gindes v. United States, 740 F.2d

947, 950 (Fed. Cir. 1984)).  Only the third exception arguably applies here.  Cf. WTTC Cmts. at

9–12.  If the Federal Circuit "clearly" had no authority to tell Commerce which weights to use,

---

U.S. 370, 375 (1982) (stating that lower courts are bound by stare decisis "no matter how
misguided the judges of those courts may think it to be"); Banks v. United States, 741 F.3d 1268,
1276 (Fed. Cir. 2014) (setting out exceptions to the mandate rule).

[6] WTTC argues that precedent establishes that the Federal Circuit cannot instruct Commerce to
use a particular method over another, and that this precedent should have colored how
Commerce interpreted the Federal Circuit's decision.  WTTC Cmts. at 9–12.  As discussed,
however, the Federal Circuit's direction does not contain any ambiguity.  Furthermore, the "spirit
of the mandate" must be considered in addition to the mandate's "letter" when interpreting the
mandate, and given the Federal Circuit's reference to the manufacturer-reported weights in its
"direct[ion]," that spirit is clearly for Commerce to use the manufacturer-reported weights.  See
TecSec, Inc., 731 F.3d at 1342.  In addition, as discussed below, it is not established that the
Federal Circuit can never tell Commerce which method to use.

either because the Federal Circuit can never do so or because it lacked authority in this case, the

Federal Circuit's "direct[ion]" might arguably be "clearly erroneous."  But as explained in Jane

Restani & Ira Bloom, The Nippon Quagmire: Article III Courts and Finality of United States

Court of International Trade Decisions, 39 BROOK. J. INT'L L. 1005, 1008, 1025 (2014), the

statute cited by WTTC, 19 U.S.C. § 1516a(c)(3), which requires the Court of International Trade

("CIT") to either affirm or remand an agency determination, does not support WTTC's

contention.  In this context remand is a procedural device to implement a contrary judicial

decision.  The remand may be as open or as restricted as necessary to effectuate the decision.

Sometimes, as in this case, the Federal Circuit decision is effectively a reversal of a particular

Commerce determination and concomitantly the CIT was required to order the same reversal in

ordering remand for the necessary replacement calculations.

        Neither case law nor statute "clearly" establishes that the Federal Circuit can never order

Commerce to select a particular method over another.  Here, the Federal Circuit took the

somewhat unusual step of choosing between two data sets and directing Commerce to use one

set and not the other.  In other words, it found the use of only one set supported by substantial

evidence.  Having made that decision, the next step was to direct the use of the one set still

available.  WTTC takes issue with the data set choice, as Commerce still does, at least for the

record, but the Federal Circuit has spoken.  WTTC may not argue, with any authority, for the

court to ignore this clear direction.  Yes, once having found Commerce's choice unsupported, the

Federal Circuit could have ordered a more open remand to let Commerce further consider its

choice or even reopen the record, but there is nothing before the court that indicates such steps

would have been useful given the Federal Circuit's decision that the record evidence did not

support Commerce's choice of data.  Commerce's explanations were made and rejected and

there is no additional data set offered.  Unfair trade records involve so many different kinds of

decisions that there is no <u>never</u> that per se prevents any particular type of remand direction.

    If the record reveals basically two choices, direction to choose one is a rational direction

and helps to avoid multiple remands and leads to finality of judicial decisions.  <u>See generally</u>

Restani & Bloom, <u>supra</u>.  Because the mandate rule applies and required Commerce to obey the

Federal Circuit, Commerce's explanation of its rationale for selecting the manufacturer-reported

weights as the "best available information" is adequate.[7]

## II.    Financial Ratios

    A.    <u>Erection/Civil Income Ratio</u>

    No party directly challenges Commerce's revised erection/civil income ratio

methodology or Commerce's explanations of it.[8]  As there is no challenge, the court will not sua

sponte analyze Commerce's choice of methodology for reasonableness or substantial evidence.

The parties have waived their right to challenge the erection/civil income ratio calculation

methodology by failing to raise before the court any issue with Commerce's methodology or its

underlying justifications.  <u>See</u> <u>Gilda Indus., Inc. v. United States</u>, 446 F.3d 1271, 1280 (Fed. Cir.

2006) (explaining that failure to raise an issue before a court results in waiver).

---

[7] The court does not reach the government's argument that Commerce "reanalyzed the record evidence" on remand.  Gov't Resp. at 7–9.  The court notes, however, that Commerce did not include evidence of any such reanalysis in its <u>Third Remand Results</u>, relying instead on the Federal Circuit's "direct[ion]."  <u>Third Remand Results</u> at 7.

[8] In its comments on Commerce's <u>Draft Third Remand Results</u> WTTC stated that Commerce should have further explained its calculations.  WTTC Draft Remand Cmts. at Attach. 1.  It did not make the argument before the court.

B.      Solicitation of Information from Ganges

As indicated, no party directly challenges the erection/civil income ratio calculation

methodology that Commerce utilized as unreasonable or unsupported by substantial evidence of

record, rather WTTC argues that Commerce's failure to request information from Ganges

"regarding how [Ganges] classifies its jobwork expenses" is an abuse of discretion because

Commerce could, with little burden, request such clarification.  WTTC Cmts. at 18–23.[9]

Presumably, WTTC believes such information might simplify the surrogate financial ratio

calculations or otherwise result in changes to its benefit.  Thus, WTTC challenges Commerce's

"per se rule" of refusing to inquire about a third party surrogate value company's financial

statements.  Id. at 20–22.  The government responds that Commerce does not have a per se rule

against requesting information from third party surrogate value companies, Gov't Resp. at 16,

but acknowledges that Commerce has a "longstanding practice" of not doing so, id. at 10.  The

government also argues that Commerce's practice, and its application of that practice here, is not

an abuse of discretion because Commerce cannot compel the submission of information from

third parties, cannot ensure the timeliness or accuracy of the information, and because requesting

and incorporating the information is "time-consuming and resource-intensive."  Id. at 11–13.  CS

Wind defends Commerce for the same reasons as the government does, CS Wind Cmts. at 18–

27, and also argues that WTTC should be judicially estopped from making its arguments because

of WTTC's "180 degree flip flop."  Id. at 26.[10]

---

[9] Commerce's refusal to seek information from a party is reviewed for abuse of discretion.  See
Wuhu Fenglian Co. v. United States, 836 F. Supp. 2d 1398, 1405 (CIT 2012) (applying abuse of
discretion standard to review of Commerce's refusal to issue supplemental questionnaires).

[10] Because the Federal Circuit directed Commerce to address this issue, see CS Wind IV, 832
F.3d at 1380, the court analyzes whether Commerce abused its discretion in refusing to seek

(continued . . .)

Commerce has the authority to request information from a third party surrogate value company.  See 19 C.F.R. § 351.301(a) ("[T]he Secretary may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information."); 19 C.F.R. § 351.102(37) (defining "person" as "any interested party as well as any other . . . enterprise, or entity") (emphasis added); Third Remand Results at 13 (acknowledging Commerce's authority to make such requests).  In addition, Commerce may specify a due date for supplemental questionnaires.  19 C.F.R. § 351.301(c)(1)(ii) ("Supplemental questionnaire responses are due on the date specified by the Secretary.").[11] Furthermore, Commerce apparently possesses the authority to verify surrogate value data.  See 19 C.F.R. § 351.307(b)(2) ("The Secretary may verify factual information upon which the Secretary relies in a proceeding . . . not specifically provided for in paragraph (b)(1) of this section.").  Commerce is not required, however, to verify publicly available surrogate value data.  See Timken Co. v. United States, 12 CIT 955, 961, 699 F. Supp. 300, 305 (1998) (concluding that it is "permissible for Commerce to employ unverified data from the designated surrogate as the 'best information otherwise available'").  Lastly, Commerce's ability to apply adverse inferences to information under 19 U.S.C. § 1677e(b)(1) applies only to information submitted by interested parties, not by third parties, and unlike the International Trade

---

clarifying information from Ganges, regardless of any change in WTTC's position.  The Federal Circuit has the discretion to waive WTTC's waiver of this issue in the earlier proceedings before Commerce and the CIT.  The court assumes the Federal Circuit has waived this default and this court must accept this result.

[11] Commerce states in its Third Remand Results that it "has no authority to compel a non-interested party to respond within the government's regulatory or statutory deadlines."  Third Remand Results at 14 (citing 19 C.F.R § 351.301).  Commerce does lack the authority to compel a timely response from a third party. 19 C.F.R. § 351.301 appears to give Commerce the authority to set a time limit for such factual submissions, but it has no remedies to impose on third parties for failure to comply.

Commission ("ITC"), Commerce does not have subpoena power over nonparties.  See 19 C.F.R.

§ 210.32 (setting out the ITC's subpoena authority); Allegheny Ludlum Corp. v. United States,

287 F.3d 1365, 1372 (Fed. Cir. 2002) ("[T]he Commission possesses the authority to issue

subpoenas in pursuing its investigations, unlike Commerce . . . .").

      Commerce has not abused its discretion in maintaining a practice of generally not seeking

clarifying information from surrogate value companies, or by declining to do so in this case.  As

WTTC points out, the burden on Commerce of drafting a clarification letter to Ganges is likely

fairly low.  WTTC Cmts. at 19.  But, Commerce cannot "compel" a timely or accurate response

from Ganges, or any other third party, by applying adverse inferences to its use of facts

otherwise available or by using subpoena power.  See 19 U.S.C. § 1677e(b)(1); 19 C.F.R.

§ 210.32; Allegheny Ludlum, 287 F.3d at 1372.  Although Commerce appears to have the

authority to verify a response as accurate, see 19 C.F.R. § 351.307(b)(2), the verification process

generally entails a significant burden on Commerce and the responder may choose not to allow

verification.  Absent the ability to obtain with some assurance a timely and accurate response,

and given the significant burden Commerce would incur in attempting to obtain accurate

information (which attempts would seem to have a high probability of failure) Commerce did not

abuse its discretion in deciding not to send a letter to Ganges, or in maintaining a practice of

generally not requesting information from third party surrogate value companies over whom it

has no control.[12]  As the court sustains Commerce's decision to rely on publicly available

information, WTTC's only challenge to the surrogate financial ratio results fails.

_____

[12] The court does not read Commerce's statement that it "does not, as a matter of course,
independently request supplemental information directly from the surrogate companies with
respect to publicly available sources of surrogate values," Third Remand Results at 14, to mean

(continued . . .)

**III.    Steel Surrogate Value**

WTTC argues that Commerce should not have rejected WTTC's comment on the <u>Draft
Third Remand Results</u> regarding Commerce's use of Steel India data as the surrogate value for
CS Wind's steel plate input.  WTTC Cmts. at 24–29.  WTTC argues that information developed
in the first administrative review shows that CS Wind made material misstatements regarding the
accuracy of the Steel India data used by Commerce in the original investigation, and that the
Steel India data used in the original investigation[13] "does not accurately reflect the steel
consumed in the production of CS Wind's wind towers."[14]  <u>Id.</u> at 24, 26–28.  WTTC contends
that Commerce has a duty to use information from a later review that significantly detracts from
the legitimacy of a prior proceeding to protect the integrity of the proceedings.  <u>Id.</u> at 24–25.
Accordingly, WTTC seeks a remand from the court to give Commerce an opportunity to
recalculate CS Wind's dumping margins.  <u>Id.</u> at 29.  The government responds that:  (1) WTTC
waived its contest of Commerce's use of the original Steel India data by failing to raise it on
appeal to the Federal Circuit in <u>CS Wind IV</u>, Gov't Resp. at 17; (2) WTTC is trying to submit
unsolicited new factual information, which Commerce refuses to consider under 19 C.F.R.
§ 351.302(d), <u>id.</u> at 18; (3) remanding would be inconsistent with the principles of the
independence and finality of an antidumping proceeding, <u>id.</u> at 18–19; and (4) Commerce is

---

that Commerce has a "per se rule" against seeking such information.  <u>See</u> WTTC Cmts. at 21
(citing <u>Third Remand Results</u> at 14).  Instead, the court understands Commerce to mean that
Commerce <u>generally</u> does not do so, because it is simply unlikely to result in valuable
information.

[13] The original Steel India data reflects prices for IS2062 grade steel.  <u>CS Wind II</u>, 2014 WL
5510084, at *2.

[14] CS Wind consumes S355 grade steel.  <u>CS Wind</u>, 2014 WL 5510084, at *2; WTTC Cmts. at
27.

required to re-open the record only in the case of "material fraud," which is absent here, id. at

19–20.

Commerce's rejection of unsolicited factual information in remand determinations is

reviewed for abuse of discretion.  See Cultivos Miramonte S.A. v. United States, 22 CIT 377,

380–81, 7 F. Supp. 2d 989, 993 (1998).  In exercising its discretion, Commerce may consider

finality interests, the extent of any inaccuracies in the earlier proceedings, the existence of any

fraud, the strength of evidence for fraud, and the fraud's materiality.  See Home Prods. Int'l, Inc.

v. United States, 633 F.3d 1369, 1381 (Fed. Cir. 2011).[15]

Here, Commerce did not abuse its discretion in rejecting WTTC's unsolicited factual

information.  Crucially, WTTC fails to identify facts in the record indicative of fraud or

"material misstatements" by CS Wind.  In arguing that CS Wind made "material misstatements,"

WTTC points to CS Wind's purported "admission that the Steel [India] data [used in the original

investigation] does not reflect the steel it consumes to produce wind towers."  WTTC Cmts. at

26.  WTTC finds this "admission" implicit in CS Wind's submission of new Steel India data

during the first administrative review.  Id. at 28.[16]  WTTC does not explain, however, why CS

Wind's submission of new Steel India data in the first administrative proceeding necessarily

---

[15] The regulations relied on by the government to argue that Commerce has the authority to reject
unsolicited factual information, 19 C.F.R. § 351.302(d) and 19 C.F.R. § 351.104(a)(2)(iii), are
not controlling here because they apply only to unsolicited questionnaire responses, and WTTC's
comment on the Draft Third Remand Results is not a questionnaire response.

[16] WTTC does not specifically identify what this new Steel India data is.  It appears, however,
that the new data is simply more specific IS2062 grade data—IS2062 E350 B0/BR/C for the
period of review of the first administrative review, rather than the IS2062 E250 Grade A/B data
used in the original investigation.  See First AR I&D Memo at 6.  In the first administrative
review, WTTC again argued that Commerce should use GTA import data, but Commerce
selected the new Steel India data as the best available information.  Id. at 5, 7, 12, 14.

entails a "material misstatement" by CS Wind in the original investigation, as opposed to, for instance, a simple update of data.

In addition, WTTC fails to explain the extent of any inaccuracy caused by Commerce's refusal to reconsider its original surrogate value data for steel plate in the original investigation in the light of the new Steel India data from the first administrative review.  The mere fact that Commerce uses different data in different proceedings is insufficient for the court to disturb Commerce's continued use of the original Steel India data in the original investigation.  See Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.").  In view of the lack of evidence of "material misstatements" by CS Wind or significant inaccuracies, and recognizing the need for finality in administrative proceedings, the court concludes that Commerce did not abuse its discretion in rejecting WTTC's unsolicited comment.

Furthermore, WTTC forewent opportunities to challenge the original Steel India data used by Commerce in the original investigation.  CS Wind submitted the new Steel India data cited by WTTC in a separate proceeding in January of 2015.  Gov't Resp. at 17; First AR I&D Memo at 9 n.25.  In February of 2015, WTTC filed comments to Commerce's Second Remand Results in this matter following the court's affirmance in CS Wind II of Commerce's use of the original Steel India data, but did not raise the issue of new Steel India data.  See generally WTTC Second Remand Results Cmts.  Neither did WTTC note any concerns raised by the new data before this court in CS Wind III, nor did it do so before the Federal Circuit in CS Wind IV.  It is far too late to resurrect this abandoned issue.  Thus, Commerce did not abuse its discretion in rejecting WTTC's unsolicited submission in the latest remand proceedings.

**CONCLUSION**

For the foregoing reasons, Commerce's <u>Third Remand Results</u> are sustained.  Judgment

will enter accordingly.


                                                <u> /s/ Jane A. Restani   </u>
                                                    Jane A. Restani
                                                       Judge


Dated: March 16, 2017
        New York, New York